**Carlos ROMERO–BARCELO, et al., Petitioners,**

**v.**

**Raymond J. DONOVAN, Secretary of Labor of the United States of America, Respondent.**

**No. 83–1516.**

United States Court of Appeals, First Circuit.

Argued Sept. 14, 1983.

Decided Nov. 30, 1983.

Luis Guinot, Jr., Washington, D.C., with whom Benjamin F. Wilson, Clifford S. Robbins, and Chapman, Duff & Paul, Washington, D.C., were on brief, for petitioners.

Mary-Helen Mautner, Washington, D.C., Counsel for Appellate Litigation, with whom Francis X. Lilly, Deputy Sol. of Labor, and Karen I. Ward, Associate Sol. for Special Appellate and Supreme Court Litigation, U.S. Dept. of Labor, Washington, D.C., were on brief, for respondent.

Jose A. Ortiz-Daliot, Washington, D.C., with whom Pena, Aponte & Ortiz-Daliot, Washington, D.C., was on brief, for intervenor The Caguas Consortium.

Before ALDRICH and SKELTON *, Senior Circuit Judges, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

This case concerns the requirements for compulsory designation of a service delivery area (SDA) under § 1511(a)(4)(A) of the Job Training Partnership Act (the Act), 29 U.S.C. §§ 1501–1781, Pub.L. 97–300, 96 Stat. 1324. The issue is whether a consortium of municipalities extending over more than one labor market area (LMA) meets the statutory requirement that it serve "a substantial part of a labor market area."

The Act took effect October 1, 1983, and replaces the former Comprehensive Employment and Training Act (CETA), 29 U.S.C. §§ 801–992. Like CETA, the new Act is designed to promote employment training for economically disadvantaged persons through a system of federal grants. The funding is initially distributed at the state level, and then further allocated among local programs in the SDAs.

On March 19, 1983, pursuant to § 1511(a)(1) of the Act, the Governor of Puerto Rico, one of the petitioners here, proposed to designate the entire territory of Puerto Rico as a single SDA, acknowledging that San Juan could demand separate SDA status if it so desired. The Governor provided a fifteen-day period for comments and requests concerning the proposed plan. On March 30 and 31, 1983, five consortia submitted requests for compulsory SDA designation under § 1511(a)(4)(A)(ii). Three of the consortia attempted to amend their requests by letters dated April 4 and 8, 1983, but the Governor found the changes untimely and considered the requests as initially filed. On April 6, 1983, the Governor denied all five consortia's requests on the ground that each consortium covered more than one LMA and was, therefore, not entitled to compulsory SDA designation. Pursuant to § 1511(a)(4)(C), all five consortia petitioned the Secretary of Labor (the Secretary) for review. On June 9, 1983, the Secretary issued a decision affirming the Governor's denials of SDA designation with respect to three of the consortia and reversing it with respect to the Mayaguez and Caguas consortia. The Governor petitioned first the Secretary, and then this court, for a stay of the Secretary's order; the petitions were denied on August 3 and 4, 1983, respectively.

The question whether the Mayaguez and Caguas consortia are entitled to compulsory SDA designation turns on a question of pure statutory interpretation. Under § 1511(a)(4)(A)(ii), the Governor *must* approve a request for designation from any consortium meeting the requirements of that subsection; he may not deny it on the basis of political discretion. Similarly, when a denial is appealed to the Secretary of Labor, the Secretary *must* uphold the Governor's action unless it is "contrary to"

* Of the Federal Circuit, sitting by designation.

or "inconsistent with" § 1511. *See* § 1511(a)(4)(C); 20 C.F.R. § 628.1(c)(4). Thus, the Governor's denial of the requests in this case, and the Secretary's subsequent reversal, reflect conflicting interpretations of the underlying requirements for compulsory designation in § 1511(a)(4)(A)(ii).

That subsection provides: "The Governor shall approve any request to be a service delivery area from any consortium of contiguous units of general local government with an aggregate population of 200,000 or more which serves a substantial part of a labor market area." Neither party disputes that the municipalities constituting the Mayaguez and Caguas consortia are contiguous units of general local government, nor that the aggregate population of each consortium exceeds 200,000. The controversy focuses exclusively on the requirement that each consortium serve "a substantial part of a labor market area."

A LMA is defined as "an economically integrated geographic area within which individuals can reside and find employment within a reasonable distance or can readily change employment without changing their place of residence. Such areas shall be identified in accordance with criteria used by the Bureau of Labor Statistics of the Department of Labor in defining such areas or similar criteria established by a Governor." § 1503(13).

Three interpretations of the LMA requirement in § 1511(a)(4)(A)(ii) are possible. The Secretary, it may be inferred, has read the provision as requiring that a consortium "serve substantial portions of all the labor market areas" within its territory. The failure to do so is the explanation given for rejecting the appeals of the other three consortia which were denied SDA designation. *See* Resp.App. at 404 (letter of June 9, 1983). We find this interpretation untenable. It has no basis in the text or structure of the statute, and is inconsistent with the plain meaning of "a labor market area" as "a single, but unspecified" LMA.[1] Moreover, although the Secretary has apparently applied his own interpretation of the statute in this case, he refuses to acknowledge a

binding, coherent "definitive statutory interpretation," purportedly on the ground that he must defer to the potentially different interpretations offered by the governors of participating states on a case-by-case basis. Resp.Br. at 10 n. 12 & 19. *Cf.* 20 C.F.R. § 627.1 ("guidelines, interpretations and definitions adopted by the Governor shall, to the extent that they are consistent with the Act and applicable rules and regulations, be accepted by the Secretary"). We find it anomalous in this case that the Secretary should flatly dismiss the Governor's interpretation as "not reasonably supportable" if his contention is based on deference to that very Governor. We note that the Secretary's problem involves construing a statute and the accompanying legislative history; the Secretary has no greater expertise than a court in such matters. We, therefore, need not give any particular deference to his interpretation. *See Stockman v. John T. Clark & Son of Boston, Inc.,* 539 F.2d 264, 269 (1st Cir. 1976).

A more plausible reading of the phrase "a labor market area," at first glance, might be "at least one" LMA. This broad reading of the subsection would permit consortia to obtain compulsory SDA designation, provided that they served a substantial portion of some LMA, without respect to whatever fragmentary or substantial parts of other LMAs that they might also contain. Although the text of the particular subsection might conceivably be construed in this way, such a result would clearly contradict the intent of Congress that SDAs be "consistent" with LMAs. *See* § 1511(a)(1)(C)(i). "It is not intended that the Job Training Partnership Act should establish an arbitrary design of new substate jurisdictions which will not enhance services to citizens." H.R.Conf.Rep. No. 889, 97th Cong., 2d Sess. 87 (1982), U.S.Code Cong. & Admin.News 1982, pp. 2636, 2709. Furthermore, if Congress had intended to place no upper limit on the size of consortia eligible for compulsory designation as SDAs, it would have made such an intent unequivocally clear, just as it did with respect to the population

---

1. *The American Heritage Dictionary* (1969), quoted in Resp.Br. at 12 n. 15.

requirement ("200,000 or more"). Indeed, the LMA reference could have been omitted altogether.

■ The third possible interpretation of the phrase "a labor market area" is "one, but not more than one" LMA. This comports with the plain meaning of the words, and, in our view, with the structure of the statute. It produces the result that consortia corresponding to single LMAs are eligible for compulsory SDA designation, but that consortia extending over multiple LMAs are not. To place our interpretation in perspective, we look to the statutory scheme as a whole.

The primary and general responsibility for establishing statewide SDA plans lies with the Governor of each state. Under § 1511(a)(1), the Governor is responsible for proposing, on the advice of the State Job Training Coordinating Council (State Council), a plan of SDAs covering the entire territory of the state. This subsection places no restrictions on the Governor's discretion with respect to the size of territory or population covered by individual SDAs— indeed, the Governor's choice ranges from "the State" to "one or more units of general local government" as the SDAs to be designated. § 1511(a)(1)(A). In exercising his discretion, the Governor is guided by two criteria: the plan should "promote effective delivery of job training services" and "be consistent with labor market areas ... or areas in which related services are provided under other State or Federal programs." § 1511(a)(1)(B)–(C). Even these criteria, though, are not absolute: the subsection does not require "designation of an entire labor market area," § 1511(a)(1)(C)(i), and its guidelines are intended "to give general guidance to the Governor" rather than to be "inflexible." S.Rep. No. 469, 97th Cong., 2d Sess. 12 (1982), U.S.Code Cong. & Admin. News 1978, pp. 2636, 2647.

After the Governor proposes his plan, interested parties such as local governments and business organizations are given "an opportunity to comment on the proposed designation of service delivery areas and to request revisions thereof." § 1511(a)(3). Requests for revisions in the plan fall into two categories: compulsory designation requests under § 1511(a)(4)(A) which the Governor must accept, and discretionary designation requests under § 1511(a)(4)(B) which the Governor may choose to accept or reject. Having reviewed the comments and requests of interested parties, the Governor makes "a final designation of service delivery areas within the State." § 1511(b).

The SDAs, once established, function as the basic administrative units of the federal job training program under the Act. In each SDA, the chief elected local official appoints a Private Industry Council to cooperate in developing a job training plan for joint submission to the Governor. §§ 1512 & 1513. The job training plan requires the Governor's approval; and if the administrators at the local level are unable to agree on a plan, the Governor may step in and "redesignate, without regard to [the compulsory designation provisions], the service delivery areas in the State to merge the affected area into one or more other service delivery areas, in order to promote the reaching of agreement." §§ 1515 & 1515(c)(1). Similarly, if a given SDA's program persistently fails to meet performance standards, the Governor may impose a "reorganization plan. Such plan may restructure the private industry council, prohibit the use of designated service providers or make such other changes as the Governor deems necessary to improve performance. The Governor may also select an alternate entity to administer the program for the service delivery area." § 1516(h)(1). The Governor is further responsible for coordinating the federal program with related state and local services, § 1531(b)(1), as well as for providing information and technical assistance, carrying out special model training and employment programs, and funding special programs for rural areas outside major LMAs, § 1531(c). The Governor thus performs central planning, supervisory, and administrative functions, regardless of whether the SDAs comprise single municipalities or an entire state. In the latter case, where the Governor himself puts together and administers a job training plan, his supervisory function devolves on the Secretary of Labor. § 1515(d).

It is clear that the Governor's function under the Act amounts to more than merely funneling federal money to local job training programs. The Act "recognize[s] the role of the state in all local programs and end[s] the excessive involvement of the federal government." S.Rep. No. 469, 97th Cong., 2d Sess. 2 (1982), U.S.Code Cong. & Admin.News 1982, 2637. On the other hand, the Act emphasizes the benefits of administering job training programs at the local level through a partnership between elected officials and the private sector.

The Act thus embodies a tension between the competing policies of efficient planning and decentralized administration. The most vivid illustration of this tension is the provision permitting the Governor to designate an entire state as a single SDA where no eligible locality or consortium requests compulsory designation. In such cases, local control is completely subordinated to the exigencies of efficient and harmonious planning of SDAs throughout the state. This is not an anomaly, but merely a balance that Congress has struck between the competency of the state and the interests of the localities. By giving the Governor primary responsibility for coordinating SDAs within the state, Congress has recognized that it is the Governor rather than local officials who is likely to be in the best position to assess the comparative merits of various possible statewide SDA plans. It has given him a corresponding measure of discretion to be exercised within the flexible guidelines of § 1511(a)(1) for the good of the state as a whole. To preserve the balance with local interests, however, Congress has carved out exceptions in § 1511(a)(4)(A) to the Governor's policy discretion.[2] That subsection imposes strict requirements with respect to size, density, and LMA status which serve both to ensure that localities falling under its terms will be concentrated and coherent enough to function as autonomous SDAs and to limit the number of localities that can compel the Governor to designate them as SDAs without regard to his statewide SDA plan. We now turn to a closer examination of the compulsory designation provisions.

Subsections 1511(a)(4)(A)(i) and (ii) contain parallel requirements for single units of general local government and consortia respectively. Both subsections specify a minimum population threshold of 200,000. This ensures that no fragmentary portion of a locality or LMA can compel the Governor to designate it as a separate SDA to the detriment of an integrated statewide SDA plan. Likewise, both subsections should logically be read to impose an upper limit on the size of SDAs eligible for compulsory designation. This is done in § 1511(a)(4)(A)(i) through the requirement of a single unit of general local government, and in § 1511(a)(4)(A)(ii) through the requirement that the consortium serve a substantial part of a LMA. Without the LMA requirement, there would be no safeguard against the formation of diffuse and unwieldy consortia demanding SDA designation and conceivably foreclosing the Governor from any participation in planning at the state level. See H.R.Conf.Rep. No. 889, 97th Cong., 2d Sess. 87 (1982). Thus, only areas which are fairly compact, self-contained, economically integrated units having the administrative resources to carry out their own job training programs are permitted to preempt the Governor's general SDA designation authority.

This does not mean that local administration must be sacrificed.[3] Under

---

**2.** Along with the compulsory designation provisions for single units of local government and consortia, § 1511(a)(4)(A) permits certain prime sponsors under the former CETA program to demand SDA designation. § 1511(a)(4)(A)(iii). That subsection is not in issue here.

**3.** Respondent points out that "[b]oth the Mayaguez and Caguas *municipalities* served as prime sponsors under CETA," Resp.Br. at 7

(emphasis added), and asserts that the local expertise of the municipalities in administering the previous job training program should not be sacrificed. *Cf.* H.R.Conf.Rep. No. 889, 97th Cong., 2d Sess. 88 (1982), U.S.Code Cong. & Admin.News 1982, p. 2710 ("the expertise of local governments [should] not be lost, nor should the population areas become so large as to create an unwieldy delivery system"). The process for designating administrative units (SDAs under the Act), however, has undergone

§ 1511(a)(4)(B), the Governor has discretion to "approve a request to be a service delivery area from any unit of general local government or consortium of contiguous units of general local government, without regard to population, which serves a substantial portion of a labor market area." Therefore, even areas which fail to meet the population requirement for compulsory designation may still request discretionary designation. The decision in such cases, guided by the criteria of effective service delivery and consistency with LMAs in § 1511(a)(1), lies with the Governor. He may as a matter of policy approve discretionary requests, or he may find that his own statewide plan is preferable. In giving the Governor discretion in this area, Congress has presumed that he is best able to coordinate the needs and interests of various localities throughout the entire state. It would be a mistake to equate compulsory designation with designation under the Governor's plan, even if the resulting SDAs were identical: the former procedure bypasses the Governor entirely, and puts the local interest of a locality before that of the state as a whole, while the latter balances local interests against one another.

█ In no event is a local government or consortium deprived of the opportunity for SDA designation; instead, that opportunity is set out in the statute, available as either a discretionary or a compulsory request.[4]

Even if a discretionary request is denied, no area is thereby deprived of the substantive benefits of the job training program. The Governor's statewide plan in that case must contain the same sort of information required of any local plan, and must pass muster with the Secretary of Labor. §§ 1514 & 1515(d). Our interpretation of the statute places no constraints on the size of SDAs eligible for designation—the Governor may designate practically any area, from a substantial part of a single LMA to the entire state, as an SDA. It is only the compulsory designation provisions which are restricted to a narrow class of municipalities and consortia. This is necessary to preserve the Governor's general authority to establish a SDA plan for the state as a whole.

In the present case, both the Mayaguez and Caguas consortia cover at least two LMAs. The Mayaguez consortium, consisting of the municipalities of Mayaguez, Anasco, Hormigueros, Las Marias, Maricao, Rincon, San German, Cabo Rojo, Lajas and Sabana Grande, covers the entire Mayaguez LMA and the entire San German LMA, as well as areas not belonging to any official LMA.[5] The Caguas consortium, as considered by the Governor and reviewed by the Secretary, consists of the municipalities of Caguas, Aguas Buenas, Gurabo, San Lorenzo and Cayey;[6] it covers roughly 80% of

---

deliberate revision, and cannot be carried over piecemeal from CETA. Not only has the population threshold been raised from 100,000 to 200,000, but also the LMA requirement has been added with respect to consortia. Thus, although the individual municipalities of Mayaguez and Caguas may have qualified as prime sponsors under CETA, there is no basis for supposing that consortia containing those municipalities should automatically be given SDA status under the Job Training Partnership Act.

4. The Secretary contends that this interpretation "would drastically inhibit the formation of consortia," and that "many consortia would automatically become ineligible to become SDAs as a matter of right under [§ 1511(a)(4)(A)(ii)] because unless they serve more than one LMA, they would simply fail to meet the statutory population threshold." Resp.Br. at 15–16. This overlooks the availability of discretionary SDA designation under

§ 1511(a)(4)(B). The fact that only a few LMAs in Puerto Rico meet the 200,000 population threshold does not mean that all the other LMAs *cannot* be designated as separate SDAs, only that they cannot force the Governor to designate them if they do not coincide with his statewide plan.

5. As the basis for applying the Act in this case, we accept the list of LMAs appended to the State Council's Report as Table I. *See* Resp. App. at 85–88.

6. This is the composition of the Caguas consortium as initially proposed on March 30, 1983. *See* Resp.App. at 7. The attempt on April 14, 1983, to add Trujillo Alto, a municipality in the San Juan LMA, was found untimely by the Governor. *See id.* at 92. The Secretary of Labor reviewed the consortia's applications on appeal from the Governor, presumably on the same documentary basis as the Governor.

the Caguas LMA and 60% of the Cayey LMA.

■ Under our view of § 1511(a)(4)(A)(ii), compulsory SDA designation is limited to consortia serving a substantial part of not more than one LMA; the Mayaguez and Caguas consortia were, therefore, properly denied designation. In light of the foregoing, we need not decide whether any provision of Puerto Rican law is preempted by the federal statute.

*Reversed.*