CONSORTIUM OF ROCKINGHAM AND STRAFFORD COUNTIES, NEW HAMPSHIRE, Petitioners,

v.

UNITED STATES DEPARTMENT OF LABOR, Respondent.

John H. Sununu, Governor of the State of New Hampshire, Intervenor.

CONSORTIUM OF BELKNAP, CARROLL, CHESHIRE, COOS, GRAFTON, MERRIMACK and SULLIVAN COUNTIES, NEW HAMPSHIRE, Petitioners,

v.

UNITED STATES DEPARTMENT OF LABOR, Respondent.

John H. Sununu, Governor of the State of New Hampshire, Intervenor.

HILLSBOROUGH COUNTY, NEW HAMPSHIRE, Petitioner,

v.

UNITED STATES DEPARTMENT OF LABOR, Respondent.

John H. Sununu, Governor of the State of New Hampshire, Intervenor.

Nos. 83–1491, 83–1492 and 83–1493.

United States Court of Appeals, First Circuit.

Argued Aug. 3, 1983.

Decided Nov. 30, 1983.

Eleanor H. Holmes, with whom Michael P. Lehman, and Sulloway Hollis & Soden, Concord, N.H., were on brief, for petitioners.

Bruce E. Mohl, Asst. Atty. Gen., Boston, Mass., with whom Gregory H. Smith, Atty. Gen., Concord, N.H., was on brief, for intervenor.

Charles I. Hadden, Washington, D.C., with whom Francis X. Lilly, Deputy Sol. of Labor, Karen I. Ward, Associate Sol. for Sp. Appellate and Supreme Court Litigation, Allen H. Feldman, Counsel for Appellate Litigation, and John A. Bryson, Washington, D.C., Atty., were on brief, for respondent.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ-GIMENEZ,* District Judge.

* Of the District of Puerto Rico, sitting by desig-

BOWNES, Circuit Judge.

This case, arising under the Job Training Partnership Act (the Act), 29 U.S.C. §§ 1501–1781 (1975 & Supp.1982), Pub.L. 97–300, 96 Stat. 1324, concerns the requirements under § 1511 for compulsory designation of service delivery areas (SDAs). Two questions of law are raised: first, whether a county in the State of New Hampshire constitutes a "unit of general local government" (UGLG), and second, whether a consortium of counties extending over more than one labor market area (LMA) serves "a substantial part of a LMA." We conclude, on the basis of the text and structure of the Act as well as a comparison with previous legislation that a single county does meet the compulsory SDA designation criteria, but that a county consortium covering multiple LMAs does not.

The Act, which enters into force on October 1, 1983, replaces the Comprehensive Employment and Training Act of 1973 (CETA), 29 U.S.C. §§ 801–992 (1975), and shares with CETA the goal of providing job training for disadvantaged individuals in order to help them to become productively employed, see 29 U.S.C. § 1501. Under the Act, federal funds are granted directly to the individual states, which then allocate the funds among the SDAs designated as administrative units. Under § 1511(a), the Governor of a participating state proposes a designation of SDAs within the state on the advice of the State Job Training Coordinating Council. Among other requirements, each SDA must be "comprised of the State or one or more units of general local government," id. § 1511(a)(1)(A). While the Governor has discretion to approve or deny a request for SDA designation from "any unit of general local government ... which serves a substantial portion of a labor market area," id. § 1511(a)(4)(B), he must approve such a request from "any unit of general local government with a population of 200,000 or more" or "any consortium of contiguous units of general local government which serves a substantial part of a nation.

labor market area," *id.* § 1511(a)(4)(A)(i)–(ii).

On March 15, 1983, the New Hampshire State Job Training Coordinating Council recommended that the State of New Hampshire be designated as a single SDA; on March 25, 1983, the Governor published a proposal in accordance with that recommendation. Objections were raised by the County of Hillsborough (Hillsborough) as well as by two consortia comprising all of the remaining counties in the state, petitioners here, under §§ 1511(a)(4)(A)(i) and (ii) respectively. Each county or consortium asserted that it met the statutory requirements for compulsory SDA designation by the Governor. On April 15, 1983, the Governor denied the counties' requests and made a final designation of the State of New Hampshire as a single SDA, *see id.* § 1511(b). The petitioners, alleging that the Governor's action violated the mandatory designation provisions of the Act, petitioned the United States Secretary of Labor (the Secretary) for administrative review, *see id.* § 1511(a)(4)(C); on June 3, 1983, the Secretary, finding no inconsistency between the denials of SDA status and § 1511 of the Act, denied the petitioners' petitions. Subsequently, the petitioners filed a petition with this court for judicial review, *see id.* § 1578.

■ We consider first Hillsborough's claim for compulsory SDA designation under § 1511(a)(4)(A)(i) of the Act. This provision requires that the entity claiming such designation be a "unit of general local government with a population of 200,000 or more." Hillsborough asserts uncontrovertedly that its population exceeds the 200,000 figure; the sole remaining question, then, is whether a county as such qualifies as a "unit of general local government" (UGLG).

In the original Senate draft version of the law, S. 2036, counties were clearly included as UGLGs. There a "unit of general local government" was defined as "any city, municipality, county, town, township, parish, village or other general purpose political subdivision with the power to levy taxes and spend funds as well as general corporate and police powers," S.Rep. No. 469, 97th Cong., 2d Sess. 41 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2636, 2676. This definition, carried over word for word from CETA, was also retained unchanged in the enacted text of the Act, except that the list of representative examples was deleted leaving only the three functional criteria: (a) general purpose political subdivision, (b) power to levy taxes and spend funds, and (c) general corporate and police powers, *see* 29 U.S.C. § 1503(26). There is no indication in the legislative history that this textual emendation reflected any change in the meaning of the phrase "unit of general local government" as expounded in the Senate Report[1]; nor do we see any reason to interpret the words differently from their use in CETA, which expressly included counties within the definition of UGLGs, *see* CETA, *supra,* § 981(a)(10). Indeed, under CETA Hillsborough was specifically determined to be a "prime sponsor," and thus qualified a priori as a UGLG under *id.* § 812(a). Under the Job Training Partnership Act, all "determinations ... issued under [CETA] shall continue in effect until modified or revoked by the Secretary, by a court of competent jurisdiction, or by operation of law other than this chapter," 29 U.S.C. § 1591(d).

Even without the express inclusion of counties in the definitional provision of the new Act, we see no reason why New Hampshire counties as such fail to meet the three criteria set forth there. Under New Hamp-

---

**1.** The definition of "unit of general local government" as it appears in the Act came from H.R. 5320, *see* H.R.Rep. No. 537, 97th Cong., 2d Sess. 11 (1982), it was substituted for the Senate version in the Conference Agreement. Nowhere is a reason for the change made explicit; in the legislative debates, however, the intent of the House sponsors seems to have been to carry over the definition of UGLGs (including counties) from CETA, *see* 128 Cong.Rec. H5079 (Aug. 4, 1982) ("[the House bill] retains the current prime sponsor system," statement of Rep. Hollenbeck); *id.* at H8448 (Oct. 1, 1982) (new Act preserves "experience and expertise developed at local levels in predecessor training programs," statement of Rep. Perkins).

shire law, "[c]ounties, like municipal corporations, are political subdivisions of the State," *Opinion of the Justices,* 99 N.H. 540, 541, 114 A.2d 879, 879–80 (1955)—they are "geographical divisions of the state for the convenient exercise of sovereign power," *O'Brien v. County of Rockingham,* 80 N.H. 522, 524, 120 A. 254, 256 (1923). We perceive further that counties are "general purpose" entities, in contrast to special purpose entities such as "school districts, sanitary districts and other governmental agencies which do not have the range of functions typical of a city," H.R.Rep. No. 659, 93d Cong., 1st Sess. (1973), *reprinted in* 1973 U.S.Code Cong. & Ad.News 2935, 2941 (legislative history to parallel definitional provision of CETA). Although the exercise of county powers extends only to "county purposes," N.H.Rev.Stat.Ann. § 23:1 (1981), these purposes are manifold and broad. In New Hampshire, the counties were originally created in the 18th century for the purpose of administering the state judicial facilities and houses of correction, and subsequently assumed responsibility for the relief of paupers, *O'Brien v. County of Rockingham,* 80 N.H. at 523–24, 120 A. at 255–56. Since then, in addition to traditional areas of activity such as maintaining courthouses, houses of correction and registries of deeds and probate, *see* N.H.Rev.Stat.Ann. § 23:3, counties have been empowered, inter alia, to acquire and manage land for recreation, *id.* § 23:2; to pay salaries and insurance for their employees, *id.* §§ 4 to 11; to maintain sewage and utility systems for county buildings, *id.* § 23:1–a; to acquire and sell property for county use, *id.* § 24:13; to condemn land for county use, *id.* § 26:1; and to pay for firefighting in unincorporated areas, *id.* § 28:7–a.

These activities which illustrate the general nature of county functions are "typical of a city" and correspond directly to the activities of municipalities.[2] The second criterion in the Act's definition of UGLGs, taxing and spending power, is expressly set out in § 24:13 of New Hampshire's Revised Statutes Annotated (power to "raise county taxes" and appropriate funds for county use). The third criterion, general corporate and police powers, is fulfilled by the broad powers of a county as a "body corporate" to sue and be sued, to acquire, hold and transfer property for county purposes, and to conclude necessary contracts and perform acts relating to county property and concerns, *id.* § 23:1. County powers correspond in many respects to municipal powers, not only in the corporate aspect, *cf. id.* § 31:1 (town is corporate body capable of suing and being sued, purchasing and holding property for public use, and making necessary and convenient contracts for town's public business), but also in the police aspect, *cf. id.* § 31:4 (town authority to relieve paupers, fight fires, maintain parks, detect crime, collect waste, etc.). "Counties generally differ from incorporated towns or cities in the extent of the corporate powers bestowed upon them," *O'Brien v. County of Rockingham,* 80 N.H. at 523, 120 A. at 255, but not in the general quality of those powers.[3] The powers of municipal corporations may in fact be *more general* than those of counties, but we perceive no fundamental qualitative difference that would justify categorically excluding counties from the Act's definition of "units of general local government."

Our interpretation of the statutory text is also in accord with the structure and purpose of the Act. In contrast to CETA,

**2.** We do not see the territorial boundaries of county powers in certain cases, *i.e.,* limitation to county buildings or unincorporated areas, as detracting from their "general purpose" quality. Rather, the territorial allocation of similar powers between counties and municipalities indicates to us a rough parity between the two levels of government.

**3.** It is true that the New Hampshire Constitution protects cities and towns specially by prohibiting the state legislature from altering their charters or form of government without the express mandate of a local referendum, N.H. Const. pt. I, art. 39. Nevertheless, although the state legislature may by contrast alter the manner of electing or certifying votes for county officials, it is likewise limited by a guarantee of the people's right to elect those officials, *id.* pt. II, art. 71. In our view, the distinction in constitutional treatment does not amount to a negation of counties' general corporate and police powers.

which emphasized a "direct Federal to local government relationship," the new Act is designed to "recognize the role of the state in all local programs and end the excessive involvement of the federal government," S.Rep. No. 469, 97th Cong., 2d Sess. 2 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2636, 2637. To this end, "the basic supervisory role previously performed by the federal government will now be turned over to the state," *id.* at 3, 1982 U.S.Code Cong. & Ad.News at 2638. This transfer of responsibility to the states, however, occurs at the expense of the federal government, not of the localities. Indeed, Congress clearly intended that "the expertise of local governments [should] not be lost, nor should the population areas become so large as to create an unwieldy delivery system," H.Conf.Rep. No. 889, 97th Cong., 2d Sess. 88 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2636, 2710. Counties, as well as municipalities, have the local expertise necessary to implement the program in accordance with the intent of Congress. Although it is noted that "the whole state service delivery area arrangement has worked well in several states," *id.* at 87, 1982 U.S.Code Cong. & Ad.News at 2709, this consideration in no way means that the Governor may disregard the provisions for compulsory SDA designation, *see id.*[4]

■ We now turn to the question of the eligibility of county consortia under § 1511(a)(4)(A)(ii). This section provides for compulsory SDA designation of "any consortium of contiguous units of general local government with an aggregate population of 200,000 or more which serves a substantial part of a labor market area." The UGLG status of the counties which have formed consortia is resolved under the same analysis as that applied to Hillsborough's claim under subsection (i); and the

population threshold is uncontrovertedly met in the cases of both consortia.

The statute, however, places the additional requirement on a consortium of counties that they serve "a substantial part of *a* labor market area" (emphasis added). This requirement is entirely absent from the provisions concerning individual UGLGs.[5] As defined in the Act, a labor market area is "an economically integrated geographic area within which individuals can reside and find employment within a reasonable distance or can readily change employment without changing their place of residence. Such areas shall be identified in accordance with criteria used by the Bureau of Labor Statistics ... in defining such areas or similar criteria established by a Governor." 29 U.S.C. § 1503(13).

In the present case, both county consortia extend over more than a single LMA. The seven-county consortium (Belknap, Carroll, Cheshire, Coos, Grafton, Merrimack and Sullivan Counties) comprises all or part of at least six distinct LMAs determined by the New Hampshire Department of Employment Security, *viz.* Berlin, Claremont, Concord, Keene, Laconia and Littleton. This consortium spans the entire distance from Canada in the north to Massachusetts in the south. The two-county consortium, Rockingham and Strafford Counties, encompasses all or part of the Dover and Portsmouth LMAs. *See* "Map of New Hampshire Counties with Labor Market Area Statistics," Petition for Review, Appendix 95–96.

Between them, the two consortia cover the entire territory of the State of New Hampshire except for Hillsborough, which, as explained above, qualifies under § 1511(a)(4)(A)(i) for compulsory SDA designation. If county consortia extending

---

**4.** The only circumstances in which the Governor may disregard the compulsory SDA designation provisions arise when the public and private implementing authorities fail to reach an agreement on a job training plan, *see* 29 U.S.C. § 1515(c)(1).

**5.** The precatory clause calling for consistency between SDAs and LMAs "shall not be construed to require designation of an entire labor

market area," 29 U.S.C. § 1511(a)(1)(C)(i), and it is "not intended to be inflexible," S.Rep. No. 469, 97th Cong., 2d Sess. 12 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2636, 2647. Although Congress has provided for coordination of multiple SDAs within a single LMA, *see* 29 U.S.C. § 1514(b)(8), there is no limitation express or implied on the number of permissible LMAs within a single SDA.

over multiple LMAs had been intended to be able to claim compulsory SDA designation, the labor market area requirement in subsection (ii) would have been superfluous; or, if present as a mere minimum standard, it would have been phrased as "any" labor market area rather than "a" labor market area. Clearly, however, Congress placed primary and general responsibility for determining SDAs with the Governor, subject only to the limitations in the compulsory-designation provisions. *See Romero-Barcelo v. Donovan,* 722 F.2d 882 at 885–886 (1st Cir. 1983). Within flexible guidelines of "effective delivery" and "consisten[cy] with labor market areas" or similar subdivisions, the Governor has discretion in designating SDAs to cover the entire state outside of compulsory-designation jurisdictions. 29 U.S.C. § 1511(a)(1); *cf.* S.Rep. No. 469, 97th Cong., 2d Sess. 12 (1982) (criteria in § 1511 (a)(1) are "not intended to be inflexible," but "to give general guidance to the Governor" in determining SDAs "into which the entire state will be divided"). Under the discretionary SDA designation provision in § 1511(a)(4)(B), the Governor may even designate SDAs based on UGLGs without regard to population, as long as they serve a substantial portion of a LMA. The whole complex statutory apparatus would be defeated if the county consortia in the present case were eligible to claim compulsory designation. It would effectively eliminate the Governor's role of coordinating SDAs "for the entire state," H.R.Conf.Rep. No. 889, 97th Cong., 2d Sess. 87 (1982), *reprinted at* 1982 U.S.Code Cong. & Ad.News 2636, 2709.

We have held in *Romero-Barcelo, supra,* that the compulsory designation provisions of § 1511(a)(4)(A)(ii) apply only to consortia covering a substantial portion of a single LMA. Under that holding, the multicounty consortia in this case will be precluded from claiming compulsory SDA designation if the Governor finds that they do not meet the statutory LMA requirement. No such requirement, however, is imposed on single units of local government under § 1511(a)(4)(A)(i); the *Romero-Barcelo* holding, therefore, does not prevent Hills-

borough County from claiming compulsory designation.

*Affirmed in part and reversed in part.*