Rafael **HERNANDEZ–COLON, Governor of the Commonwealth of Puerto Rico,** Petitioner, Appellant,

v.

**SECRETARY OF LABOR, et al.,** Respondents, Appellees.

No. 87–1470.

United States Court of Appeals, First Circuit.

Heard Nov. 5, 1987.

Decided Jan. 6, 1988.

---

Harris Weinstein with whom Covington & Burling, Washington, D.C., was on brief, for petitioner, appellant.

Marcia A. Lurensky with whom George R. Salem, Sol. of Labor, Charles D. Ray-

mond, Associate Sol. for Employment and Training, and Robert J. Lesnick, Acting Counsel for Litigation, Washington, D.C., were on brief, for respondent, appellee Secretary of Labor.

Gary D. Michaels with whom Krivit & Krivit, P.C., Washington, D.C., was on brief, for respondents, appellees The Municipality of Ponce, Puerto Rico, The Municipality of Utuado, P.R., and The Ponce–Utuado Job Training Consortium.

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Ponce and Utuado are municipalities organized under the laws of the Commonwealth of Puerto Rico. They wish collectively to design and administer a comprehensive employment training program for economically disadvantaged townspeople seeking to better their prospects. The engine which these two communities have chosen to propel their joint effort is the Job Training Partnership Act (JTPA), 29 U.S.C. §§ 1501–1592 (1982 & Supp. IV 1986). Following JTPA protocol, the municipalities asked the Governor of Puerto Rico, Rafael Hernandez Colon, petitioner herein, to designate Ponce/Utuado as a unified service delivery area (SDA). Petitioner refused. The municipalities appealed to the federal Secretary of Labor. The Secretary determined that the Ponce/Utuado consortium met all applicable criteria for SDA status, found the denial inconsistent with the imperatives of JTPA, and sustained the appeal. The Governor, not content to let the matter lie, initiated this proceeding. We believe that the Secretary did not err, and therefore dismiss the petition.

I

We pause on the brink to address our appellate jurisdiction. The statutory medium by which the municipal respondents originally challenged the Governor's decision—29 U.S.C. § 1511(a)(4)(C)—allows an "entity" which has been refused SDA status, like the Ponce/Utuado joint venture, to seek federal administrative review. After

the administrative process has run its course, further protests are governed by 29 U.S.C. § 1578(a)(1).[1] That statute provides in pertinent part that,

> with respect to a denial of an appeal under § 1511[a](4)(C) ... any party to a proceeding which resulted in such final order may obtain review of such final order in the United States Court of Appeals....

29 U.S.C. § 1578(a)(1). At first blush, the phrase "with respect to a denial of an appeal" seems tailored to allow SDA applicants to seek further (judicial) review when they have exhausted their administrative appeals, without ceding a parallel privilege to a governor (or any other person, for that matter). Put another way, § 1578(a)(1) can be read to furnish an avenue for judicial review *only* when an appeal to the Secretary fails—not when it succeeds. Neither life nor statutory construction is, however, quite so simple. Placed in context, the language of § 1578(a)(1) admits of another, more plausible meaning.

We note, first, that the enactment permits "any party" to seek judicial review. A governor certainly fits within this description. If Congress intended to exclude state actors—Puerto Rico is considered a "state" under JTPA, *see* 29 U.S.C. § 1503(22)—it had a bevy of suitable phrases at its command to achieve that end, *e.g.*, "any community," "any appellant," "any applicant." Indeed, a more limited term— "entity"—was used in § 1511(a)(4)(C) (granting applicants who had been denied SDA designation leave to seek the Secretary's intervention). Yet, Congress eschewed such circumscription; in inscribing the judicial review provision, it used considerably more inclusive language. Taken in full context, the (admittedly awkward) locution of § 1578(a)(1) may mean that once an administrative appeal has been taken under § 1511(a)(4)(C) from the denial of SDA status, "any party" to the ensuing administrative proceeding may thereafter essay judicial review of the Secretary's final order.

Where there are two available interpretations of a statute, we must turn to the legislative purpose and history in search of guidance. *See, e.g.*, *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed. 2d 891 (1984). As we show later in the text, JTPA creates—and depends upon—a delicate balance of federal, state, and local interests. It would be a rude (and senseless) intrusion upon this equipoise to deny a state which has been rebuffed by the Secretary essentially the same right of judicial review which is afforded to dissatisfied units of local government. Even though the letter of the law may appear to point one way, we are mindful that any uncertainty in a statute should be construed with an eye toward the discernible objectives of the legislation. *See First Nat'l Bank v. Walker Bank*, 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966). That being so, we are constrained to adopt the more flexible meaning of the language suggested by the statutory context. As the Court observed almost a century ago,

> If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity.

*Church of the Holy Trinity v. United States*, 143 U.S. 457, 460, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

Though "absurdity" may be too strong a description, there is no rhyme or reason for restricting initiation of judicial review under § 1511(a)(4)(C) to local entities alone— nor is there anything in the legislative history which intimates that a one-way street of that sort was thought desirable. It seems evident to us that Congress intended governors to have recourse to the courts to the same (limited) extent as disappointed SDA applicants; and the language of JTPA is, we think, sufficient to animate this intention. In an earlier case, we assumed *sub silentio* that such jurisdiction existed. *See Romero–Barcelo v. Donovan*, 722 F.2d 882 (1st Cir.1983). Today, we make the rule explicit. We hold that 29 U.S.C. § 1578(a)(1) allows any party aggrieved by the Secretary's final SDA determination,

---

**1.** Apart from § 1578(a)(1), JTPA contains no other provision which can be read as permitting a state to contest the Secretary's granting of SDA status in the courts.

including the state, to seek review in the courts of appeals. The right to review obtains whether the Secretary affirms, or, as here, reverses a governor's denial of SDA status. Accordingly, we are invested with subject matter jurisdiction and may proceed to consider the merits.

## II

The municipalities' joint application for SDA designation was fashioned under 29 U.S.C. § 1511(a)(4)(A).[2] In itself, this portion of the JTPA is a *rara avis:* it does not exhibit the deference to the wisdom and wishes of the state which characterizes so much of the statutory scheme.[3] Rather, § 1511(a)(4)(A) identifies three narrow sets of circumstances wherein no room is left for state discretion. In each of these three instances, assuming that the basic criteria are met, a governor is *required* to grant SDA status for the asking.

In this case, the focus was on § 1511(a)(4)(A)(ii). Notwithstanding the mandatory language of that subsection, the petitioner refused to place his imprimatur on the municipalities' joint application. Although he now concedes that Ponce and Utuado were "units of general local government with an aggregate population of 200,000 or more" which served "a sub-stantial part of one or more labor market areas," he claims that their proffer was deficient because they failed (a) to meet the requirements of Puerto Rico law for formation of an intermunicipal consortium, and (b) to apply in a timely fashion. To frost the cake, the Governor also contends that Ponce and Utuado were not "contiguous" within the meaning of JTPA, and were thus ineligible for shared SDA designation.

Despite the availability of this asseverational array, the sponsors lost little time in appealing the Governor's rejection of their application. The Secretary reversed, finding the decision to deny SDA status to the consortium to be completely at odds with the provisions of the JTPA.[4] We review the Secretary's determination under 29 U.S.C. § 1578(a)(3). We are obliged to treat his findings of fact as "conclusive if supported by substantial evidence." *Id.* We can, however, afford plenary review to questions of law. In this case, we discern no error, factual or legal. We agree entirely with the Secretary that petitioner had no right to checkmate the proposed Ponce/Utuado move.

## III

We have previously discussed the backdrop and the overall operation of the JTPA

---

**2.** The statute reads:

The Governor shall approve any request to be a service delivery area from—

(i) any unit of general local government with a population of 200,000 or more;

(ii) any consortium of contiguous units of general local government with an aggregate population of 200,000 or more which serves a substantial part of one or more labor market areas; and

(iii) any concentrated employment program grantee for a rural area which served as a prime sponsor under the Comprehensive Employment and Training Act.

29 U.S.C. § 1511(a)(4)(A). The quoted language contains an amendment passed by Congress in 1986 to require compulsory designation of an SDA even though it serves more than one labor market area. *See* Job Training Partnership Act Amendments of 1986, Pub.L. No. 99–496, § 2, 100 Stat. 1261 (1986). The amendment reverses the specific holding in *Romero–Barcelo v. Donovan,* 722 F.2d at 888. Nevertheless, we continue to find the opinion enlightening as to matters of more general interest.

**3.** One important purpose of the JTPA was to substitute state for federal management of the job training function—to "recognize the role of the state in all local programs and end the excessive involvement of the federal government." S.Rep. No. 469, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Admin. News 2636, 2637.

**4.** Although petitioner bemoans the lack of detailed administrative findings, we do not regard the Secretary's decision as procedurally flawed in any sense. In our view, it provided an adequate—if concise—explanation for the Secretary's determination. Given the relatively limited, altogether clearcut margins of the inquiry, we believe that "the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas–Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). We, at least, are left with no doubt as to the Secretary's grounds. That being so, we will not take him to task for sparseness of phrase. As appellate judges should know, windiness for its own sake is no virtue in the decisionmaking process.

in exegetic detail, *see Romero–Barcelo v. Donovan*, 722 F.2d at 883–88, and we have no occasion today to repastinate that familiar ground. We essay instead an overview of only so much of the statutory language and legislative history as we deem directly pertinent to this appeal.

JTPA was enacted "to afford job training to [ ] economically disadvantaged individuals and other individuals facing serious barriers to employment." 29 U.S.C. § 1501. JTPA's immediate predecessor in the universe of federally-sponsored job training programs, the Comprehensive Employment and Training Act (CETA), formerly codified at 29 U.S.C. §§ 801–999, had proven less than extravagantly successful. Informed opinion seemed to suggest that excessive federal involvement was partially to blame for CETA's problems. *See supra* n. 3. Under JTPA, the state supplanted the federal government as the "key actor." S.Rep. No. 469, *supra*, at 3, 1982 U.S.Code Cong. & Admin.News at 2638. But key actor or not, it was never intended that the state be the *only* actor. JTPA was premised upon "a recognition of the distinct but legitimate roles of federal, state and local government." *Id.* It was Congress' desire that "the expertise of local governments not be lost." H.Conf.Rep. No. 889, 97th Cong., 2d Sess. 88, *reprinted in* 1982 U.S. Code Cong. & Admin.News 2636, 2710. Indeed, JTPA was purposefully designed to take maximum advantage of "the benefits of administering job training programs at the local level." *Romero–Barcelo*, 722 F.2d at 886.

To be sure, the state, in the person of its governor, was given the primary responsibility for overall coordination of service delivery areas under the statute as a whole. *See id.* at 885. Yet, the specific section of the JTPA which is before us comprises a marked detour around the Act's usual routing. As we have recognized before, it is in § 1511(a)(4)(A) that "Congress has carved out exceptions[ ] to the Governor's policy discretion." *Romero–Barcelo*, 722 F.2d at 886 (footnote omitted). Accordingly, "the Governor *must* approve requests [for SDA designation] filed by local government jurisdictions" meeting the requirements of § 1511(a)(4)(A). H.Conf.Rep. No. 889, *supra*, at 87, 1982 U.S.Code Cong. & Admin.News at 2709 (emphasis supplied). The legislative annals make it manifest that Congress intended nothing less than "automatic [SDA] designation" for qualifying entities under § 1511(a)(4)(A), irrespective of gubernatorial preference. *Id.* at 2710. *See also Romero–Barcelo*, 722 F.2d at 883 (describing mechanics of § 1511(a)(4)(A)(ii) as envisioning "compulsory SDA designation" for qualified consortia).

The mandatory provisions contained in § 1511(a)(4)(A) are distinctive, standing in stark and deliberate contrast to the remainder of the JTPA. Virtually all of the other statutory roads to SDA designation, unlike § 1511(a)(4)(A), involve the exercise of broad discretion at the state level. *E.g.,* 29 U.S.C. § 1511(a)(1) (governor responsible for proposing plan of SDAs for the entire state); S.Rep. No. 469, *supra*, at 12, 1982 U.S.Code Cong. & Admin.News at 2647 (statutory guidelines anent § 1511(a) intended "to give general guidance" rather than to be "inflexible"). This distinctiveness demands special handling, for the trio of narrow exceptions crafted in § 1511(a)(4)(A) constitute the only local-leaning counterweights to the sweeping authority granted to the states in the designation process. Preserving the delicate balance between state and local power which Congress so obviously thought important must inform our examination of the litigants' positions in this proceeding. At the bottom line, as we see it, a state may not refuse SDA designation under § 1511(a)(4)(A)(ii) by the exercise of political discretion or because a governor, however well-intentioned, decides that the communities are not suitable JTPA partners. *See Romero–Barcelo*, 722 F.2d at 883.

## IV

The Governor's insistence that the union between Ponce and Utuado is illegitimate for JTPA purposes depends in the first instance upon the premise that the phrase "any consortium" as employed in 29 U.S.C. § 1511(a)(4)(A)(ii) can only refer to a con-

sortium duly formed under state law. From this assumption, the petitioner proceeds to argue that municipalities have no inherent power to form consortia in Puerto Rico. They must, he tells us, comply with the Puerto Rico statute regulating the formation of "intermunicipal bodies," which provides in pertinent part as follows:

> The municipality shall have all the powers that are ... incidental and necessary to exercise the following functions: ... To create intermunicipal bodies.... Their organization shall be made by agreement signed by the Mayors, with the approval of the Municipal Assemblies concerned and of the Governor of Puerto Rico.

P.R. Laws Ann. tit. 21, § 2054(21) (1985).

We assume, without deciding, that both the petitioner's initial premise and his understanding of local law are correct.[5] If that be the case, then § 2054(21) comes into play. Ponce and Utuado, without a doubt, have complied with two of its three requirements: they have entered into an agreement signed by their respective mayors, and each local legislature has ratified it. All that is arguably lacking is the Governor's approval of the consortium.

■ We are of the opinion that JTPA does not excuse a municipality from compliance with state laws which are consistent with it. We readily acknowledge that the supremacy of federal law is a "basic underpinning of our federal system." *Louisiana Public Service Comm'n v. FCC,* 476 U.S. 1890, 106 S.Ct. 1890, 1901, 90 L.Ed.2d 369 (1986). Nevertheless, in enacting the JTPA, Congress did not express a clear wish to preempt all state intermunicipal regulation. Nor can we read JTPA so comprehensively as to postulate a congressional intention to occupy the entire field of intermunicipal regulation. To the contrary, the architecture of JTPA is such that resort to state law is necessary in order to round out some of the details of the statutory scheme. *See, e.g., Consortium of Rockingham and Stratford Counties v.*

*Department of Labor,* 722 F.2d 888, 890 (1st Cir.1983) (state law informs construction of term "unit of general local government" in JTPA).

■ All that is well and good—but there are boundaries past which state legislatures cannot inch. If and to the extent that a "state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress," the state law must bend to accommodate the federal. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *Accord Palmer v. Liggett Group Inc.,* 825 F.2d 620, 626 (1st Cir.1987). This is such a case.

The provision of Puerto Rico law which gives a governor the power of life and death over JTPA consortia—unbridled power, exercisable in a standardless way—"disturbs too much the congressionally declared scheme." *Id.* To subjugate § 1511(a)(4)(A)(ii) to such a provision would be to cede to the states precisely the sort of broad, unfettered political discretion which Congress so plainly intended to eliminate from that small corner of the SDA designation process. Approval in that sphere, as we have noted earlier, was to be "automatic." H.Conf.Rep. No. 889, *supra,* at 88, 1982 U.S.Code Cong. & Admin.News at 2710. The across-the-board veto power which this petitioner has grasped by virtue of his reading of local law throws fistfuls of sand into the "automatic" gears of § 1511(a)(4)(A). It is blatantly disruptive of, and wholly inconsistent with, the machinery of the statute. If we were to validate the Governor's present claim, we would rudely upset the equilibrium between state and local interests so painstakingly orchestrated by the Congress and, in the bargain, impermissibly tilt the statutory balance in favor of state interests.

We cannot countenance such an erosive result. Thus, we hold that, insofar as Puerto Rico law authorizes a governor "to engage in conduct that the federal Act forbids," *Michigan Canners & Freezers Ass'n v. Agricultural Marketing and Bar-*

---

5. The municipalities argue that § 2054, read as a whole, affords them sufficient powers (general and specific) to enter into a JTPA consortium without meeting the criteria of § 2054(21). We need not reach that question and express no opinion thereon.

**964**

*gaining Board*, 467 U.S. 461, 478, 104 S.Ct. 2518, 2527, 81 L.Ed.2d 399 (1984), it frustrates the objectives of § 1511(a)(4)(A) and is therefore preempted. "What is mandatory is mandatory," *Consortium of Cities v. Department of Labor*, 811 F.2d 1316, 1317 (9th Cir.1987), and must so remain. Consequently, the Governor's non-acquiescense does not bar SDA designation for the Ponce/Utuado consortium.

## V

■ The assertion that the application for SDA designation was too late need not unduly detain us. It is an utterly baseless proposition.

First, there is no credible evidence in this record that any meaningful deadline for applications was set, or that local communities were apprised of one. Second, if we were prone to accept the Governor's supposition that applications had to be completed by February 27, 1987, it would avail him naught; the Ponce/Utuado filing was complete on that date. The mere fact that the Governor found it inconvenient to wait until the close of business before acting is entirely beside the point. A state's chief executive cannot erect factitious obstacles to SDA approval in an arbitrary or highhanded way, nor can he transform a handsome coach of an application into a scrawny pumpkin merely because he decides—subjectively—that midnight has arrived. In this case, the conclusion that the Ponce/Utuado application was seasonably advanced is an inescapable one.[6]

## VI

■ The final lap run by petitioner involves his insistence that Ponce and Utuado are not "contiguous" within the meaning of 29 U.S.C. § 1511(a)(4)(A)(ii). This thesis has two facets: he claims that the statute, fairly interpreted, bars the two communities from joining forces to form an SDA; and that, in any event, he possesses the authority to superimpose a gubernatorial gloss on the phraseology of § 1511(a)(4)(A)(ii). We find both contentions to be specious.

We deal first with the unadorned language of the statute. As we have already pointed out, Congress withdrew all semblance of discretion from the states in the enactment of § 1511(a)(4)(A). It elected to use clear, unambiguous language—"contiguous"—to manifest the necessary intermunicipal relationship. Despite the mental gymnastics in which petitioner would have us engage, the word "contiguous" has a common, unwavering, and well-accepted meaning: touching at a part of one or more boundaries. Petitioner concedes that Ponce and Utuado fit the usual definition: they share a mutual border (if for but a short stretch). No forensic acrobatics are either necessary or desirable to make the municipalities' case. There is a "strong presumption that Congress expresses its intent through the language it chooses." *INS v. Cardoza–Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987). Accordingly, the plain meaning of the statute conclusively settles the question unless there is some clearly expressed legislative intention to the contrary. *United States v. James*, 478 U.S. 597, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986). In this instance, there is not.

Here, giving the word "contiguous" its ordinary connotation promotes, rather than detracts from, the discernible policy objectives of § 1511(a)(4)(A). Under the congressional blueprint, only a definition which can be instantly applied, one which leaves no room for discretion, can be truly consistent with JTPA. To honor the Governor's entreaty—that "contiguous" should be read to require not only some common geographic boundary but an overarching functional component as well (say, direct routes of travel or a pattern of economic interaction)—would run at cross purposes with the demonstrated congressional intent. Such a reading of the statute would leave too much space for subjective differences of opinion—in short, for political dis-

---

6. We note that, even if the Ponce/Utuado application was not complete by the supposed February 27 "deadline," the Governor had no right to deny it for that reason. Tardiness would, in the worst of cases, do no more than postpone the effective date of SDA designation.

cretion—to fill in the definitional interstices. This is exactly the sort of thing that Congress set out to avoid when it provided for compulsory designation of SDAs under § 1511(a)(4)(A).[7]

Petitioner also implores that we defer to his notion of contiguity because the Secretary, in reviewing the denial of SDA designation, was bound to accept "guidelines, interpretations and definitions adopted by the Governor." 20 C.F.R. § 627.1 (1986). That argument entirely overlooks the primacy of the qualifying condition: such guidelines, interpretations and definitions are only to be accepted "to the extent that they are consistent with the [JTPA]." *Id.* Congress so plainly and purposefully eliminated the state's discretionary role under § 1511(a)(4)(A) that we cannot allow the Governor to stand that legislative choice on its head. It is beyond his domain to reinject discretion into the equation by such simple expedients as interpreting language to suit his whim or plotting guidelines which lead far afield from the direction which Congress sought to have the program take. To define "contiguous" in the rococo manner suggested by petitioner would be entirely foreign to, and inconsistent with, the statute itself.

Given the legislative mandate, we cannot properly concern ourselves with the purported difficulty of travel between the two communities, the existence of separate labor market areas, or other socioeconomic desiderata. Indeed, the political wisdom of the requirements which petitioner seeks to engraft onto the statute is altogether immaterial. What counts is that we must be leery of constructions, such as the Governor's expansive rendering of contiguity, which tend to "frustrate the policy that Congress sought to implement." *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).

In the last analysis, the Governor asks too much. Courts are not at liberty to rewrite statutes willy-nilly, nor to allow executive officers (federal or state) to do so. No other branch of government can add ingredients to a congressionally mandated mix when the plain meaning, purport, and history of the legislative recipe suggest the contrary. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). This is but another instance where "[t]he legislative branch has made its policy choices and the courts must honor them." *Irons v. FBI,* 811 F.2d 681, 689 (1st Cir.1987). So, too, the Governor.

In sum, the definition of "contiguous" championed by the Secretary is the conventional one. It is accepted in ordinary usage. It is precise and simple of application. It contains no shadings, no blind corners, no room for discretion. It is, we think, the definition which Congress had in mind. In the Secretary's view, Ponce and Utuado—which share a common border for nearly half a mile—were contiguous municipalities. We emphatically agree. Petitioner had no right to reject the application for lack of contiguity.

## VII

When the municipalities of Ponce and Utuado filed their application with the Governor, they did so in due, proper, and timely fashion. They collectively constituted a consortium of contiguous municipalities which met all of the criteria for mandatory SDA designation under 29 U.S.C. § 1511(a)(4)(A)(ii). The petitioner's refusal of their request for SDA status was, therefore, unlawful and inconsistent with the imperatives of JTPA. On appeal, the Secretary acted to right this wrong. He did not err in so doing.

---

**7.** Petitioner distorts the aims of § 1511(a)(4)(A) when he claims that Congress established the conditions for mandatory designation not to check gubernatorial power, but to encourage efficiency, that is, to reduce the overall number of administrative units without compromising effective service. Such a restrictive focus mistakes the reality of the situation. It was the population thresholds within the mandatory designation provisions, not some fancied state discretionary powers, which were designed to achieve this balance. *See* H.Conf.Rep. No. 889, *supra,* at 88, 1982 U.S.Code Cong. & Admin. News at 2710.

The petition for review is denied and dismissed, and the decision of the Secretary of Labor is therefore

Affirmed.