# United States Court of Appeals

## For the First Circuit

No. 02-2530

MARIA DEL ROSARIO ORTEGA; SERGIO BLANCO,
by themselves and representing minors
BEATRIZ BLANCO-ORTEGA and PATRIZIA BLANCO-ORTEGA,

Plaintiffs, Appellants,

v.

STAR-KIST FOODS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Lynch, Circuit Judges.

Freddie Pérez-González, with whom Juan J. Martínez-Rodríguez and Freddie Pérez-González & Assoc., P.S.C. were on brief, for appellants.
David C. Indiano, with whom Alexander H. Bopp and Indiano & Williams, P.S.C. were on brief, for appellee.

June 2, 2004

**LYNCH**, **Circuit Judge**.  In April 1999, Beatriz Blanco-Ortega, then nine years old, cut her right pinky finger on a can of Star-Kist tuna.  That is not normally the stuff of lawsuits in federal court, but her injuries were more than trivial and led to surgery, the prospect of future surgery, and minor permanent disability and scarring.  Beatriz, along with her parents and sister, sued in federal court, asserting diversity jurisdiction.  28 U.S.C. § 1332.  The claims of Beatriz's family members were composed of emotional distress damages, with the mother asserting medical expenses as well.  Plaintiffs' choice of federal court was no doubt influenced by the fact that civil jury trials are unavailable in the local courts of Puerto Rico.

The case raises two issues.  First is the classic question whether each of the plaintiffs meets the amount-in-controversy requirement for diversity jurisdiction.  28 U.S.C. § 1332(a).  The district court, using an analytic approach that we have since rejected, see Stewart v. Tupperware Corp., 356 F.3d 335, 339 (1st Cir. 2004), held that it was a legal certainty that none of the plaintiffs' claims was worth $75,000 and so dismissed the case for lack of jurisdiction.  As to the injured child, Beatriz, we reverse and hold that it is not a legal certainty that she could not recover an award over $75,000.  But we uphold the district court's conclusion that none of Beatriz's family members satisfies the amount-in-controversy requirement.

The second question is whether Beatriz's family members may nonetheless remain as plaintiffs under the supplemental jurisdiction statute, 28 U.S.C. § 1367. This is a very difficult question, new to this court, on which the circuits have split. We hold that by limiting supplemental jurisdiction to "civil action[s] of which the district courts have original jurisdiction," § 1367(a), Congress preserved the traditional rule that each plaintiff in a diversity action must separately satisfy the amount-in-controversy requirement. Accordingly, we affirm the dismissal of Beatriz's family members' claims for lack of subject-matter jurisdiction.

**I.**

On April 17, 2000, Beatriz Blanco-Ortega, along with three family members, filed a diversity suit against Star-Kist Foods Inc., Star-Kist Caribe Inc., and their unnamed insurers in the district of Puerto Rico. Besides Beatriz, the plaintiffs consisted of her mother, Maria del Rosario-Ortega; her father, Sergio Blanco; and her sister, Patrizia Blanco-Ortega. The defendants promptly moved to dismiss the complaint for lack of jurisdiction, claiming that there was not complete diversity of citizenship because Star-Kist Caribe Inc., the branch of Star-Kist that does business in Puerto Rico, was a Puerto Rico citizen for purposes of the diversity statute. The district court agreed and dismissed the complaint without prejudice.

The plaintiffs re-filed their complaint on February 28, 2001, this time only naming Star-Kist Foods, Inc. and its unnamed insurers as defendants. The complaint alleged that Beatriz had suffered physical damages of not less than $500,000 and emotional damages of not less than $400,000. It also alleged that each of her three family members had suffered emotional damages in excess of $150,000 and that Mrs. Ortega had also incurred $4,927.07 in past medical expenses and $25,000 in estimated future medical expenses.

On October 24, 2001, Star-Kist moved for summary judgment, alleging that none of the plaintiffs could satisfy the $75,000 amount-in-controversy requirement. The district court agreed and on July 18, 2002, once again dismissed all of the plaintiffs' claims without prejudice for want of jurisdiction. The four plaintiffs appeal that decision.

**II.**

**A. Amount-in-Controversy Requirement**

In 1938, the Supreme Court established the basic standard by which to evaluate a challenge that a plaintiff has not met the jurisdictional amount-in-controversy requirement:

> The rule governing dismissal for want of jurisdiction in cases brought in federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938) (internal citations omitted).

"Under St. Paul, a plaintiff's allegations of damages that meet the amount-in-controversy requirement suffices unless questioned by the opposing party or the court." Spielman v. Genzyme Corp., 251 F.3d 1, 5 (1st Cir. 2001). Once a defendant questions jurisdiction by challenging the amount of damages alleged in the complaint, the burden shifts to the plaintiff to show that it is not a legal certainty that the claims do not involve the requisite amount.[1] Id. at 4; Barrett v. Lombardi, 239 F.3d 23, 30-31 (1st Cir. 2001). "A party may meet this burden by amending the pleadings or by submitting affidavits." Dep't of Recreation & Sports v. World Boxing Ass'n, 942 F.2d 84, 88 (1st Cir. 1991). When there are several plaintiffs, each must present claims that meet the jurisdictional amount.[2] Clark v. Paul Gray Inc., 306 U.S. 583, 589 (1939). Once a district court dismisses for failure to

---

[1] At one point, the district court wrongly said that "once the defendant challenges the amount of damages alleged in the complaint, then the burden shifts to the plaintiffs to establish facts indicating that, to a legal certainty, the claims involve more than the jurisdictional minimum." This is incorrect; the plaintiff need only show it is not a legal certainty that the claims will not result in a verdict for the amount in controversy. The double negative has substantive meaning. Ultimately, it appears the district court did use the correct standard regarding the plaintiffs' burden despite this error in laying out the law.

[2] We address the supplemental jurisdiction question below.

meet the jurisdictional amount, the court of appeals reviews that judgment de novo.  Spielman, 251 F.3d at 4.

The basic error committed by the district court was to evaluate the amount-in-controversy by reference to amounts that the Supreme Court of Puerto Rico has found reasonable in tort cases. As we noted in Stewart, the analogy is imperfect in multiple respects, most notably because Puerto Rico does not have jury trials in civil cases.  356 F.3d at 339.  We thus conduct the amount-in-controversy inquiry de novo, looking to each plaintiff individually.

The plaintiffs presented the following evidence in response to Star-Kist's challenge to the amounts alleged in the complaint: the deposition testimony of each of the four plaintiffs, the medical report of Dr. Zegarra (Beatriz's treating physician), hospital records, receipts for the payment of Beatriz's treatment, pictures of Beatriz's hand after the surgery, and the testimony of both the school nurse and the school paramedic who initially treated Beatriz when she cut herself.

This evidence established that after Beatriz cut her pinky finger while opening a can of Star-Kist tuna, she went to the school infirmary.  The nurse and a paramedic were able to stop the bleeding after fifteen to thirty minutes.  The nurse said that the cut was deep and bled profusely.  A school official called Mrs. Ortega at home to tell her about Beatriz's injury, and Mrs. Ortega

went to the school to pick up Beatriz. Mrs. Ortega then took Beatriz to the emergency room of a nearby hospital, where a doctor indicated that Beatriz may have severed her tendons and nerves. Mrs. Ortega contacted Dr. Zegarra, a hand surgeon, by phone while she was at the hospital, and scheduled an immediate appointment. Together, Mrs. Ortega and Beatriz went immediately from the hospital to Dr. Zegarra's office.

Dr. Zegarra confirmed that Beatriz had in fact damaged her nerves and tendons and determined that she required surgery. He was unable to secure an operating room for that day, so the surgery was scheduled for April 22, the next day. The surgery, which required Beatriz to be put under general anesthesia, successfully repaired Beatriz's deep flexor tendon and digital nerve. After the surgery, Beatriz attended physical therapy, which was painful, three times a week for a three-month period. Beatriz continued the physical therapy for eight months in total and wore a cast throughout that entire period. The therapy impaired her ability to write and paint in school and forced her to drop out of a volleyball tournament. Her finger bears a small scar and is slightly bent. Despite the successful surgery, Beatriz has been diagnosed with a 3% partial permanent impairment of the functioning of her hand. The medical prognosis is that the injury could become worse as she grows and that she may need more surgery.

Given Beatriz's permanent physical impairment, the surgery, and the claimed pain and suffering (bearing in mind the potential impact of the injury and its aftermath on a young girl), we cannot say to a legal certainty that Beatriz could not recover a jury award larger than $75,000. See Stewart, 356 F.3d at 340 (plaintiffs met jurisdictional minimum where evidence suggested that each had suffered permanent physical impairment, had endured non-trivial pain and suffering damages by having to spend honeymoon in a hospital, and might require future medical services); Gebbia v. Wal-Mart Stores, Inc., 233 F.3d 880, 883 (5th Cir. 2000) (plaintiff's allegations that, as a result of falling in defendant's store, she sustained injuries to her wrist, knee and back, resulting in permanent disability and disfigurement and causing pain and suffering and lost wages, were sufficient to meet jurisdictional amount-in-controversy requirement); Rosenboro v. Kim, 994 F.2d 13, 18-19 (D.C. Cir. 1993) ("[T]he presence of medical evidence showing that a plaintiff is suffering from a continuing or permanent physical impairment [is] an important indicator" in determining whether the plaintiff meets the amount-in-controversy requirement).

The other plaintiffs fare differently. Mrs. Ortega presented evidence that she paid $4,927.07 for past medical expenses and says that she anticipates paying $25,000 in future medical expenses. She also claims that her emotional distress

-8-

damages totaled $250,000. We assume arguendo that Mrs. Ortega can claim the past medical expenses and some future medical expenses.[3] But there was no support at all for the $25,000 figure for future medical expenses that she alleged, and a lower figure appears to be in order, given that past expenses were less than $5,000. Even if she could claim all $25,000, there is still quite a gap between the medical expenses and $75,000.

We conclude that Mrs. Ortega cannot fill this entire gap with her emotional distress damages. Cf. Jimenez Puig v. Avis Rent-A-Car Sys., 574 F.2d 37, 40 (1st Cir. 1978) (amount-in-controversy requirement of $10,000 was not met in claim for short-lived embarrassment and anger resulting from a car-rental clerk's public destruction of credit card and announcement that plaintiff had failed to pay his bills). One of the normal responsibilities of parenthood is dealing with a child's cuts and scrapes, and here the injuries were relatively minor. Neither Beatriz nor her mother sought any counseling relating to the injury. Moreover, Mrs. Ortega did not personally witness Beatriz's accident or the immediate aftermath.

Mrs. Ortega tries to argue that she meets the jurisdictional amount by relying on remittitur cases. Certainly courts may resort to analogous cases involving remittitur in

---

[3] As for future medical expenses, Mrs. Ortega suggested in her deposition that any future surgery Beatriz might have on her finger would be elective.

determining whether a plaintiff can meet the amount-in-controversy requirement in a diversity case. But the utility of remittitur cases will vary depending on at least three factors -- the factual similarities between the cases, the difference in viewpoints between the start of a case and the end of a case, and both the jury award in the remittitur case and the amount to which it was reduced.

Remittitur of a jury award is ordered when the award is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1197 (1st Cir. 1995). In such cases, the rule in this circuit is that the jury award should be remitted "to the maximum that would be upheld by the trial court as not excessive." Jones & Jones v. Pineda & Pineda, 22 F.3d 391, 398 (1st Cir. 1994). The plaintiff has a choice between accepting the remittitur amount or opting for a new trial. See Liberty Mut. Ins. Co. v. Cont'l Cas. Co., 771 F.2d 579, 588 (1st Cir. 1985).

While remittitur determinations are based on what has been proved at trial, amount-in-controversy determinations are made at the outset of the case. See generally 14B Wright & Miller, Fed. Prac. & Proc. § 3702 (2d ed. 2003). This different procedural lens complicates determining whether there is sufficient factual similarity between the remittitur case and the jurisdictional case.

To be useful, the facts of injury and damages that were actually proved to the jury in the remittitur case must be similar to the facts, taken in the light most favorable to the plaintiff, that could be proved in the jurisdictional case.

Moreover, for an analogy to a remittitur case to be useful, the difference between the numbers involved in the remittitur case must be taken into account. These amounts are (1) the jury award that was deemed excessive in a remittitur case and (2) the amount to which that award was remitted. If, assuming the cases are otherwise similar, both numbers are above the jurisdictional minimum (i.e., $75,000), then the remittitur case supports the conclusion that the amount-in-controversy requirement has been met. Similarly, if both the jury award and the amount to which it was remitted are less than $75,000, that supports the conclusion that the amount-in-controversy requirement cannot be met.

More problematic are remittitur cases hovering around the jurisdictional amount -- i.e., cases in which the jury award is above the jurisdictional amount but the amount to which the award was remitted is below the jurisdictional amount. In theory, the amount to which the award was remitted should be the maximum possible amount that was legally permissible, and thus should be the applicable basis of comparison. But theory is often a long way from reality. As we have noted before, "converting feelings such

-11-

as pain and suffering and the loss of enjoyment of life into dollars is not an exact science." Smith, 177 F.3d at 33 n.5. One safety valve for the inherent difficulty in selecting a remittitur amount is that the plaintiff is given the choice of accepting the reduced amount or opting for a new trial. See Liberty Mut. Ins. Co., 771 F.2d at 588. The difficulty in converting pain and suffering into a dollar amount makes each case very fact-specific, thus decreasing the usefulness of a remittitur case hovering around the jurisdictional amount.

Mrs. Ortega argues by reference to a remittitur case, Smith v. Kmart Corp., 177 F.3d 19 (1st Cir. 1999). In that case, a husband and wife were shopping in defendant's store when the wife was struck on the head by a cooler that fell from a shelf. Id. at 22. As a result of the blow, the wife lost consciousness for close to a minute, leading the husband to administer mouth-to-mouth resuscitation. Id. at 22. He testified that he believed his wife was dead. Id. at 23. Eventually an ambulance arrived, and paramedics placed a cervical collar around the wife's neck and transported her on to the ambulance using a stiff board that had been placed underneath her. Id. at 22. The wife suffered from the blow for months after the injury. Id. The jury awarded the husband $250,000 in emotional distress damages, and the appellate court remitted that award to $100,000. Id. at 32-33. Mrs. Ortega argues that her case is similar to the husband's in Smith and that

even the $100,000 amount to which damages were remitted in that case is larger than the $75,000 minimum.

Mrs. Ortega's reliance on Smith fails even though both the original award and the reduced amount were greater than the jurisdictional minimum, because Mrs. Ortega's case is not sufficiently factually similar to Smith. Beatriz's injury, on the basis of the plaintiffs' complaint, was not nearly as dramatic or disruptive as the wife's injury in Smith. No one believed that Beatriz would die of the cut on her finger and there was no dramatic witnessing of the accident, unlike in Smith. Moreover, unlike the husband in Smith, Mrs. Ortega has not alleged that the accident has in any way strained her relationship with Beatriz. See id. at 23.

Beatriz's sister Patrizia has an even less substantial claim for emotional distress damages than her mother. Patrizia was a student in Washington, D.C. at the time of the injury and did not return home due to the accident. Although she did take Beatriz to some physical therapy sessions after she returned from school over the summer, Patrizia did not miss any work or school obligations to do so. Like the others, there is no evidence of Patrizia's receiving any counseling services in connection with her little sister's injury. It is legally certain that Patrizia could not recover an award over $75,000 for her emotional distress.

It is also legally certain that the claims of Beatriz's father, Sergio Blanco, do not meet the $75,000 threshold. Mr. Blanco is divorced from Beatriz's mother and does not live with Beatriz. He spent half a day at the hospital during Beatriz's surgery, but he did not bring Beatriz to any medical appointments. Mr. Blanco's claim to emotional distress damages over $75,000 is too tenuous.

In short, only Beatriz's claim satisfies the jurisdictional requirements of § 1332. Her family members' claims do not meet the minimum amount-in-controversy, and no other independent basis for federal jurisdiction (e.g., federal question jurisdiction) exists over those claims.

## B. Supplemental Jurisdiction under § 1367

This leaves the issue of supplemental jurisdiction. Beatriz's family members cannot file their own suits against Star-Kist in federal court. The question is whether the supplemental jurisdiction statute, 28 U.S.C. § 1367, allows them to proceed in federal court nonetheless on the basis of Beatriz's jurisdictionally sufficient claim.

Though simple to state, the question has not been answered in this circuit,[4] and its proper resolution is far from clear. The courts of appeals are sharply divided over whether

---

[4] We noted the issue in the class-action context in Spielman v. Genzyme Corp., 251 F.3d 1, 7 n.5 (1st Cir. 2001).

§ 1367 allows parties who cannot themselves satisfy § 1332's amount-in-controversy requirement to sue in federal court by joining forces with a plaintiff who can. The Supreme Court once granted certiorari to resolve the matter, but it ultimately split 4-4 and affirmed without opinion. See Free v. Abbott Labs., Inc., 529 U.S. 333 (2000).[5]

The problem has actually arisen in two contexts, each of which is the subject of a circuit split. First, there are cases -- like Beatriz's -- involving the ordinary joinder of additional plaintiffs under Fed. R. Civ. P. 20. Compare Stromberg Metal Works, Inc. v. Press Mech., Inc., 77 F.3d 928, 932 (7th Cir. 1996) (where one plaintiff satisfies the amount-in-controversy requirement, § 1367 permits jurisdiction over transactionally related claims by co-plaintiffs who do not), with Meritcare, Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214, 216 (3d Cir. 1999) (each co-plaintiff must independently satisfy the amount-in-controversy requirement). Second, there are cases involving the claims of absent class members in diversity-only class actions. Compare Allapattah Serv., Inc. v. Exxon Corp., 333 F.3d 1248, 1254 (11th Cir. 2003) (section 1367 authorizes jurisdiction over all class members' claims if the named plaintiffs satisfy the amount-in-controversy requirement); Gibson v. Chrysler Corp., 261 F.3d

_____

[5] An unexplained affirmance by an equally divided Court has no precedential value. See Rutledge v. United States, 517 U.S. 292, 304 (1996).

-15-

927, 934 (9th Cir. 2001) (same); Rosmer v. Pfizer, Inc., 263 F.3d 110, 114 (4th Cir. 2001) (same); and In re Abbott Labs., 51 F.3d 524, 528 (5th Cir. 1995) (same), with Trimble v. Asarco, Inc., 232 F.3d 946, 962 (8th Cir. 2000) (section 1367 does not extend jurisdiction over class members who do not independently meet the amount-in-controversy requirement); and Leonhardt v. W. Sugar Co., 160 F.3d 631, 640 (10th Cir. 1998) (same).[6]  Because the same statutory language applies in both contexts, some courts have lumped the two together for purposes of § 1367.  See, e.g., Meritcare, 166 F.3d at 218; Stromberg, 77 F.3d at 931.  Our case involves only Rule 20 joinder, however, and we express no view regarding the application of § 1367 in class actions.[7]

Even aside from the circuit split, this is an area where courts are wise to tread carefully.  The problem of pendent-party jurisdiction implicates some of the most sensitive and enduring issues in the law of federal jurisdiction, and it directly affects

---

[6] The district courts in our circuit are similarly split. Compare Payne v. Goodyear Tire & Rubber Co., 229 F. Supp. 2d 43, 52 (D. Mass. 2002) (section 1367 permits supplemental jurisdiction over pendent party plaintiffs who do not themselves satisfy requirements of § 1332); and Duhaime v. John Hancock Mut. Life Ins. Co., 177 F.R.D. 54, 60 (D. Mass. 1997) (same), with Arias v. Am. Airlines, Inc., 163 F. Supp. 2d 111, 115 (D.P.R. 2001) (each plaintiff must independently meet the requirements of diversity jurisdiction); and Mayo v. Key Fin. Servs., Inc., 812 F. Supp. 277, 278 (D. Mass. 1993) (same).

[7] In our view, class actions raise unique problems that will be better addressed with the benefit of briefing and argument in a case requiring us to consider them.  See infra note 19.

-16-

the allocation of judicial business among the state and federal courts. In the end, certainty can come only from Congress or the Supreme Court. For now, we disagree with the Seventh Circuit and join the Third Circuit in holding that, at least in cases of Rule 20 joinder, § 1367 did not upset the settled rule that each plaintiff must independently satisfy the diversity statute's amount-in-controversy requirement.

1. Background

Before 1990, it is clear, Beatriz's family members could not have joined in Beatriz's diversity suit unless they each stood to recover more than the minimum amount required for jurisdiction. As early as 1911, the Supreme Court declared that "[w]hen two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount." Troy Bank v. G.A. Whitehead & Co., 222 U.S. 39, 40 (1911). That rule is now commonly associated with Clark v. Paul Gray, Inc., 306 U.S. 583 (1939), which reaffirmed Troy Bank after the adoption of the Federal Rules of Civil Procedure. See 306 U.S. at 589. Even after United Mine Workers v. Gibbs, 383 U.S. 715 (1966), in which the Supreme Court approved pendent-claim jurisdiction in federal-question cases, see id. at 725, Clark remained good law: "[M]ultiple plaintiffs with separate and distinct claims must each satisfy the jurisdictional-amount requirement for suit in the

federal courts." <u>Zahn</u> v. <u>Int'l Paper Co.</u>, 414 U.S. 291, 294 (1973); <u>see also</u> <u>Aldinger</u> v. <u>Howard</u>, 427 U.S. 1, 15-16 (1976) (distinguishing pendent-party jurisdiction from the type of pendent-claim jurisdiction permitted in <u>Gibbs</u>).  If the <u>Clark</u> rule applies in this case, we should affirm the dismissal as to Beatriz's family members but vacate as to Beatriz, thereby leaving Beatriz free to choose between proceeding alone in federal court or voluntarily dismissing her complaint and re-filing together with her family in the Puerto Rico courts.  <u>See</u> <u>Clark</u>, 306 U.S. at 590.

Whether <u>Clark</u> continues to apply today depends on how one reads 28 U.S.C. § 1367, the supplemental jurisdiction statute, which was enacted by Congress in 1990.  <u>See</u> Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089, § 310.  In relevant part, § 1367 provides:

(a)  Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b)  In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over

-18-

> claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

The impetus for Congress's adoption of § 1367 was the Supreme Court's 5-4 decision in Finley v. United States, 490 U.S. 545 (1989). See generally Raygor v. Regents of the Univ. of Minn., 534 U.S. 533, 539-40 (2002). Finley did not deal with the amount-in-controversy requirement. Rather, the plaintiff in Finley had filed suit against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), alleging that the government's failure to maintain certain airport runway lights had contributed to the death of her husband and children in an airplane accident. 490 U.S. at 546. Later, she amended her complaint to add state-law tort claims against two new defendants, a municipality and a utility company. No independent basis for federal subject-matter jurisdiction existed over those claims. Id. The Supreme Court acknowledged that the plaintiff could not have brought her entire action in state court because federal jurisdiction in FTCA cases is exclusive, but it held nevertheless that the district court lacked jurisdiction over the "pendent-party" state-law claims. Id. at 555-56. The Court concluded by noting that Congress was free to reverse that result if it wished. Id. at 556.

Congress did so in § 1367. See Raygor, 534 U.S. at 540; id. at 550 (Stevens, J., dissenting); Ponce Fed. Bank, F.S.B. v.

-19-

The Vessel "Lady Abby", 980 F.2d 56, 58 (1st Cir. 1992) (Breyer, C.J.) (section 1367 overturns Finley). The text of the statute, however, can be read to do more than overturn Finley.[8] The jurisdictional grant, which appears in section (a), is not limited to cases like Finley involving exclusive federal jurisdiction, or even to federal-question cases generally. Instead, subsection (a) permits the district courts to hear any claim arising from the same constitutional case or controversy "in any civil action of which the district courts have original jurisdiction." Subsection (b) then creates an exception to that grant for certain claims in diversity cases. The result is a jurisdictional grant of such apparent breadth that, as one commentator succinctly put it, "the statute has created confusion in a number of areas in which principles were thought to be well established." 13B Wright, Miller, & Cooper, Fed. Prac. & Proc. § 3567.2 (2d ed. 2003).

2. Section 1367 and the Clark Rule

One such area of confusion involves the continued validity of Clark in the wake of § 1367. The case law on this issue is split between two competing interpretations of § 1367.

---

[8] See Arthur & Freer, Grasping at Burnt Straws: The Disaster of the Supplemental Jurisdiction Statute, 40 Emory L.J. 963, 980 (1991) ("Congress could have overruled the holding in Finley quite simply and cleanly, without affecting other areas. . . . Why the statute had to go further, we do not know. That the statute went further, there can be no doubt.").

-20-

The first, adopted by the Seventh Circuit in <u>Stromberg</u>, turns on Congress's failure to include Rule 20 plaintiffs among those parties who cannot rely on supplemental jurisdiction where doing so would be inconsistent with § 1332.  <u>See</u> § 1367(b) (restricting supplemental jurisdiction over parties joined as plaintiffs under Rules 19 or 24, but omitting Rule 20 plaintiffs). On this reading, § 1367 overturns <u>Clark</u> and extends supplemental jurisdiction over claims asserted by diversity plaintiffs who cannot meet the amount-in-controversy requirement, provided that at least one plaintiff in the action has a jurisdictionally sufficient claim.  <u>See</u> <u>Stromberg</u>, 77 F.3d at 930-32.

The second interpretation, originally suggested in an article by Professor Pfander[9] and later adopted by the Tenth Circuit in <u>Leonhardt</u>, emphasizes the requirement in § 1367(a) that the district court must first have "original jurisdiction" over an action before supplemental jurisdiction can apply.  <u>See</u> <u>Leonhardt</u>, 160 F.3d at 640 (citing Pfander).   On this reading, § 1367 <u>preserves</u> the rule in <u>Clark</u> and thus does not supply supplemental jurisdiction where, as in this case, only one of the named plaintiffs meets the amount in controversy.   Although <u>Leonhardt</u> was a class action case, the Third Circuit subsequently endorsed its reasoning in <u>Meritcare</u>, a Rule 20 joinder case with facts

---

[9] Pfander, <u>Supplemental Jurisdiction and Section 1367: The Case for a Sympathetic Textualism</u>, 148 U. Pa. L. Rev. 109 (1999).

-21-

analogous to the case at bar.  <u>See</u> 166 F.3d at 221-22 (citing <u>Leonhardt</u> with approval).

We recognize that plausible textual arguments can be made in favor of either of these readings.  For the reasons that follow, however, we conclude that <u>Leonhardt</u> and <u>Meritcare</u> embody the better reading of § 1367.

a.  <u>Text of § 1367</u>

We begin with the text of the statute.  <u>BedRoc Ltd.</u> v. <u>United States</u>, 124 S. Ct. 1587, 1593 (2004).  Given the historical and legal background against which Congress enacted § 1367, we think the <u>Leonhardt</u>/<u>Meritcare</u> approach makes the best sense of the statutory text.  Still, neither <u>Leonhardt</u> nor <u>Meritcare</u> fully explained the historical and doctrinal significance of Congress's choice of words in § 1367.  Given the long history of the Judicial Code and the enormous body of law and scholarship that surrounds it, that context provides a crucial guide to the meaning of the statute.  <u>See</u> <u>Nat'l Archives & Records Admin.</u> v. <u>Favish</u>, 124 S. Ct. 1570, 1579 (2004) (assuming, in interpreting a federal statute, that "Congress legislated against [a] background of law, scholarship, and history").

The first sentence of § 1367 specifies that supplemental jurisdiction can only apply in a "civil action of which the district courts have original jurisdiction."  § 1367(a).  That phrase unambiguously invokes the language that Congress has used

for more than two hundred years to confer jurisdiction on the federal district courts in civil cases. Nearly every jurisdictional grant in Title 28 provides that "the district courts shall have original jurisdiction" of "civil action[s]" within the scope of the grant. See, e.g., 28 U.S.C. §§ 1331 (federal questions), 1332 (diversity), 1335 (interpleader), 1337 (antitrust), 1338 (intellectual property), 1339 (postal matters), 1340 (internal revenue). Such grants, in turn, have been the subject of judicial interpretation for centuries. E.g., Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806). By invoking the concept of a district court's "original jurisdiction" over a "civil action," Congress presumptively incorporated into § 1367 the longstanding, judicially developed doctrines that determine whether those statutes confer "original jurisdiction" over a particular civil action. See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 614-15 (2001) (Scalia, J., concurring) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken . . . ." (quoting Morissette v. United States, 342 U.S. 246, 263 (1952))).

That is important because, under well-settled law, joinder and aggregation have different implications for the

existence of "original jurisdiction" in federal-question and diversity cases. Under the federal-question statute, 28 U.S.C. § 1331, the original jurisdiction of the district courts is triggered if the action "aris[es] under the Constitution, laws, or treaties of the United States." All that is required is the federal question. Osborn v. Bank of United States, 22 U.S. (9 Wheat) 738, 822 (1824) (Marshall, C.J.); see City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 164-66 (1997). Joinder questions arise only after "original jurisdiction" is established, and only to the extent that the court seeks to decide non-federal questions incident to disposition of the federal question.[10] See Osborn, 22 U.S. at 822.

Under § 1332, by contrast, joinder and aggregation questions can actually determine whether the district court has "original jurisdiction" over the action. Joinder affects original jurisdiction through the complete diversity rule of Strawbridge v. Curtiss, supra. See Wisconsin Dep't of Corr. v. Schacht, 524 U.S. 381, 389 (1998) ("The presence of [a] nondiverse party automatically destroys original jurisdiction . . . ."). Aggregation issues affect original jurisdiction because Clark

---

[10] Until 1980, the federal question statute also had an amount-in-controversy requirement. See Act of Dec. 1, 1980, Pub. L. No. 96-486, § 2, 94 Stat. 2369 (eliminating the amount-in-controversy requirement from § 1331). If that requirement were still in effect today, aggregation issues would affect the existence of "original jurisdiction" under § 1331.

prohibits multiple plaintiffs from combining their claims to clear the amount-in-controversy bar. See 306 U.S. at 589. Strawbridge and Clark, in turn, are binding interpretations of the diversity statute. See State Farm Fire & Casualty Co. v. Tashire, 386 U.S. 523, 530-31 (1967) (complete diversity rule is statutory); Snyder v. Harris, 394 U.S. 332, 336 (1969) (Clark anti-aggregation rule is statutory). Unless both rules are satisfied, the statute does not confer original jurisdiction on the district court. Sheldon v. Sill, 49 U.S. (8 How.) 441, 449 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers.").

Thus, Congress preserved both Clark and Strawbridge by providing that, before supplemental jurisdiction can attach, the district court must first have "original jurisdiction" over the action. See Pfander, Supplemental Jurisdiction and Section 1367: The Case for a Sympathetic Textualism, 148 U. Pa. L. Rev. 109, 148-49 (1999). In a diversity case, if the Clark rule is not met, or if the parties are not completely diverse, then the "original jurisdiction" requirement in § 1367(a) is not satisfied and supplemental jurisdiction will not attach. On the other hand, if the parties are completely diverse and each plaintiff separately meets the amount-in-controversy requirement, then § 1332 is satisfied and the "original jurisdiction" requirement is met. If so, § 1367 will support any transactionally related claims that the plaintiffs may wish to bring -- but only so long as § 1367(b) is

satisfied, and only as long as original jurisdiction is not destroyed. This last qualification is important because it precludes a plaintiff from, for example, using § 1367 to circumvent Strawbridge by amending her complaint to add a nondiverse party after "original jurisdiction" is initially established. Cf. Grupo Dataflux v. Atlas Global Group, L.P., 124 S. Ct. 1920, 1926 (2004) (noting that a post-filing change in the parties to an action, unlike a change in the initial parties' citizenship, can affect subject-matter jurisdiction); Am. Fiber & Finishing, Inc. v. Tyco Healthcare Group, L.P., 362 F.3d 136, 140-41 (1st Cir. 2004) (subject-matter jurisdiction was destroyed and dismissal was required where a diversity plaintiff amended its complaint to join a non-diverse party).

On this reading of § 1367, Beatriz's family members cannot rely on supplemental jurisdiction to support their claims: their complaint does not satisfy Clark, so "original jurisdiction" fails under § 1332. Snyder, 394 U.S. at 336. As a result, this "civil action" is not one "of which the district courts have original jurisdiction," and § 1367 does not apply.

We are persuaded to adopt this reading of the statutory text for several reasons. First, it gives effect to Congress's requirement that the district court must have "original jurisdiction" over the "civil action" before supplemental jurisdiction can apply. See Bui v. DiPaolo, 170 F.3d 232, 237 (1st

-26-

Cir. 1999) (statutes should be interpreted to give effect to every word and phrase).  Congress could have applied a different test in § 1367(a) -- for example, it could have permitted supplemental jurisdiction whenever any single claim in the action would have supported original jurisdiction if it had been brought by itself.[11] But that is not what the statute says.[12]  See Pfander, supra, at 141

---

[11] The dissent would apply such a test in this case.  According to the dissent, § 1367 authorizes supplemental jurisdiction whenever the district court has "original jurisdiction over a claim." (emphasis added).  The problem with the dissent's theory is that § 1367(a) does not refer to original jurisdiction over "claims."  Rather, the statute requires a "civil action of which the district courts have original jurisdiction."  § 1367(a) (emphasis added).

That distinction is critical.  The Supreme Court has never held that original jurisdiction exists over a "civil action" under § 1332 simply because one claim in the action is between diverse parties and exceeds the jurisdictional minimum.  On the contrary, original jurisdiction does not lie unless all of the parties in the case are diverse.  See Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 388 (1998) ("A case falls within the federal district court's 'original' diversity 'jurisdiction' only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State.").  Similarly, § 1332 is not satisfied, and original jurisdiction over the "civil action" does not exist, unless each plaintiff independently satisfies the amount-in-controversy requirement.  Snyder, 394 U.S. at 336; Clark, 306 U.S. at 589.  Because the complaint in this case fails this requirement, original jurisdiction over the "civil action" is absent and § 1367 is inapplicable.

[12] The dissent argues that a single claim is sufficient to create original jurisdiction over a "civil action" under § 1332 because courts are not normally required to dismiss the entire action when a jurisdictional flaw is discovered. Rather, a court may simply dismiss the offending parties.  See, e.g., Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 836 (1989) (courts of appeals may cure jurisdictional defects by dismissing dispensable nondiverse parties); Clark, 306 U.S. at 590 (dismissing parties who failed to meet the amount-in-controversy requirement but retaining

-27-

(noting that the statute "appears to reject the notion that a single, jurisdictionally sufficient claim will support the exercise of plenary pendent jurisdiction in diversity matters").

Second, our reading of § 1367's "original jurisdiction" requirement is consistent with the settled meaning of identical language in 28 U.S.C. § 1441, the removal statute. Section 1441, like § 1367, applies only if the "civil action" in question is one "of which the district courts . . . have original jurisdiction." § 1441(a). Relying on that language, the Supreme Court has interpreted § 1441 to prohibit removal unless the entire action, as it stands at the time of removal, could have been filed in federal court in the first instance. See, e.g., Sygenta Crop Protection, Inc. v. Henson, 537 U.S. 28, 33 (2002); Okla. Tax Comm'n v. Graham, 489 U.S. 838, 840 (1989) (per curiam). Section 1441 has thus been held to incorporate the well-pleaded complaint rule, see City of Chicago, 522 U.S. at 163; the complete diversity rule, see Caterpillar, Inc. v. Lewis, 519 U.S. 61, 73 (1996); and rules for calculating the amount in controversy, see St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 291-92 (1938). By the time

jurisdiction over the party that satisfied it). This argument confuses the existence of original jurisdiction with remedies for its absence. Original jurisdiction over the "civil action" may be achieved by dismissing certain dispensable parties. But as long as the offending parties are present, original jurisdiction over the "civil action" cannot exist, see Schacht, 524 U.S. at 389 ("The presence of [a] nondiverse party automatically destroys original jurisdiction . . . ."), regardless of whether any single claim in the action would satisfy § 1332 by itself.

-28-

Congress enacted § 1367 in 1990, this interpretation of § 1441(a) was well-settled. <u>See, e.g.</u>, <u>Okla. Tax Comm'n</u>, 489 U.S. at 840; <u>Caterpillar Inc.</u> v. <u>Williams</u>, 482 U.S. 386, 392 (1987); <u>Met. Life Ins. Co.</u> v. <u>Taylor</u>, 481 U.S. 58, 63 (1987); <u>Franchise Tax Bd.</u> v. <u>Constr. Laborers Vacation Tr.</u>, 463 U.S. 1, 27 (1983).

Given this background, it is significant that Congress included the same "original jurisdiction" requirement in § 1367. <u>See</u> <u>Erlenbaugh</u> v. <u>United States</u>, 409 U.S. 239, 243-44 (1972) (noting that "practical experience in the interpretation of statutes [indicates that] a legislative body generally uses a particular word with a consistent meaning in a given context"). Congress purposefully employed language in § 1367(a) that had already been interpreted in § 1441 to incorporate the traditional doctrines of federal jurisdiction -- including <u>Strawbridge</u> and <u>Clark</u>.

Another advantage of our interpretation of § 1367 is that it aligns statutory supplemental jurisdiction with the judicially developed doctrines of pendent and ancillary jurisdiction as they existed prior to <u>Finley</u>. Congress took the opportunity in § 1367 to codify the doctrines of pendent and ancillary jurisdiction under a single heading. <u>See</u> <u>City of Chicago</u>, 522 U.S. at 165; <u>Iglesias</u> v. <u>Mut. Life Ins. Co.</u>, 156 F.3d 237, 241 (1st Cir. 1998). Neither of those doctrines permitted a diversity plaintiff to circumvent the requirements of § 1332 simply by joining her claim in an action

-29-

brought by another, jurisdictionally competent diversity plaintiff.[13]  We see no indication in § 1367 that Congress wanted to alter that rule.  Notably, where Congress did intend to alter existing law in § 1367, it took pains to do so directly and unequivocally.  See § 1367(a) (repudiating Finley in a separate sentence: "Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").

Finally, our interpretation explains the omission of Rule 20 plaintiffs from § 1367(b).  This was the "apparent incongruity" on which the Seventh Circuit relied in Stromberg.  See 77 F.3d at 932.  Stromberg reasoned that because Congress omitted claims by Rule 20 plaintiffs from § 1367(b), it must have intended to allow permissively joined plaintiffs to bring claims that § 1332 would not otherwise support.  Id. at 931-32.  In our view, there is a better explanation.  The permissive joinder of a nondiverse party,

_____

[13] The doctrine of pendent jurisdiction, which allowed plaintiffs to assert non-federal claims in federal court, was applicable only in federal-question cases. See 7C Wright, Miller, & Kane, Fed. Prac. & Proc. § 1917 n.7 (2d ed. 2004); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 348-49 (1988); see also Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 370 (1978) (noting that the lower court had erred in relying on Gibbs, a pendent jurisdiction case, because the case before the court did not involve a federal claim). Ancillary jurisdiction, by contrast, applied in both federal-question and diversity cases, but that doctrine "typically involve[d] claims by a defending party haled into court against his will." Kroger, 437 U.S. at 376 (emphasis added); see also id. at n.18. Moreover, the Court in Kroger made clear that a party could not resort to ancillary jurisdiction where doing so would effectively circumvent the complete diversity rule. See id. at 375-77.

whether in the original complaint or afterwards, destroys complete diversity and thus deprives the court of "original jurisdiction." Schacht, 524 U.S. at 389; Am. Fiber & Finishing, 362 F.3d at 140-41. Likewise, "original jurisdiction" is destroyed by the joinder of a Rule 20 plaintiff who, like Beatriz's family members, cannot satisfy the amount-in-controversy requirement. See Snyder, 394 U.S. at 336-37 (noting that the requirement that each plaintiff must separately pass the amount-in-controversy bar derives from § 1332).[14] Supplemental jurisdiction in such a case fails at the threshold of § 1367(a), so there was simply no need for Congress to include Rule 20 plaintiffs in subsection (b) in order to preserve Clark or Strawbridge. See Pfander, supra, at 148.

A few courts have rejected this reading of § 1367 on the ground that nothing in the statute suggests the phrase "original jurisdiction" has a different meaning in diversity cases than in federal-question cases. See, e.g., Gibson v. Chrysler Corp., 261 F.3d 927, 936 (9th Cir. 2001); Payne v. Goodyear Tire & Rubber Co.,

---

[14] The Supreme Court has not specifically held that plaintiffs joined under Rule 20 after the filing of the original complaint must also satisfy the amount-in-controversy requirement. That result, however, is probably inevitable in light of Clark and Snyder, for "[o]therwise an appellate court could be called on to sustain a decree in favor of a plaintiff who had not shown that his claim involved the jurisdictional amount, even though the suit were dismissed on the merits as to the other plaintiffs who had established the jurisdictional amount for themselves." Clark, 306 U.S. at 590; cf. Am. Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP, 362 F.3d 136, 140-41 (1st Cir. 2004) (addition of a non-diverse party after filing of original complaint destroyed diversity jurisdiction).

229 F. Supp. 2d 43, 50-51 (D. Mass. 2002). That argument is misplaced. The requirement of "original jurisdiction" in § 1367(a) has the same meaning in every case: that some underlying statutory grant of original jurisdiction must be satisfied. What differs between federal question and diversity cases is not the meaning of "original jurisdiction" but rather the requirements of sections 1331 and 1332. Under § 1331, the sole issue is whether a federal question appears on the face of the plaintiff's well-pleaded complaint; the identity of the parties and the amounts they stand to recover are largely irrelevant. Section 1332, by contrast, predicates original jurisdiction on the identity of the parties (i.e., complete diversity) and their ability to meet the amount-in-controversy requirement. So the "original jurisdiction" language in § 1367 operates differently in federal-question and diversity cases not because the meaning of that term varies, but because the requirements of the underlying statutes are different.

Nor does this reading of the statute make § 1367(b) superfluous. By itself, § 1367(a) would authorize a wide variety of supplemental claims in diversity cases -- counterclaims by defendants, cross-claims among plaintiffs, claims by and against intervenors, and so on. Section § 1367(b) is important because it ensures that this authorization does not functionally undermine the requirements of § 1332. Suppose, for example, that the defendant in a diversity case impleads a nondiverse party under Fed. R. Civ.

P. 14. Section 1367(b) would prevent the plaintiff from asserting a non-federal claim against the impleaded party. This example, of course, is <u>Owen Equip. & Erection Co.</u> v. <u>Kroger</u>, 437 U.S. 365 (1978), in which the Supreme Court held that permitting ancillary (now supplemental) jurisdiction over such a claim would allow diversity plaintiffs to "defeat the statutory requirement of complete diversity by the simple expedient of suing only those defendants who were of diverse citizenship and waiting for them to implead nondiverse defendants." <u>Id.</u> at 374. Section 1367(b) codifies <u>Kroger</u>'s anti-circumvention rationale, not merely as against parties impleaded under Rule 14, but in a variety of situations in which "original jurisdiction" may technically exist but the exercise of supplemental jurisdiction "would be inconsistent with the jurisdictional requirements of section 1332." <u>See</u> Rowe, Burbank, & Mengler, <u>A Coda on Supplemental Jurisdiction</u>, 40 Emory L.J. 993, 995 (1991) (explaining that subsection (b) implements <u>Kroger</u>'s rationale). Nothing about our interpretation of § 1367(a) obviates this provision.

Admittedly, our reading of § 1367 is not perfect. One difficulty is that while § 1367(b) does not mention Rule 20 plaintiffs, it does refer to "claims by persons proposed to be joined as plaintiffs under Rule 19" -- a reference that is technically unnecessary under our reading of the statute, since the joinder of a nondiverse party as an indispensable plaintiff would

likewise destroy original jurisdiction under § 1332.[15]  See, e.g.,
Gonzalez v. Cruz, 926 F.2d 1, 5 (1st Cir. 1991).  And, on policy
grounds, there are certainly litigation efficiencies to be gained
by an interpretation of § 1367 that would permit Beatriz's family
members' claims to proceed in federal court alongside her own.  See
Stromberg, 77 F.3d at 932.

But no reading of § 1367 is perfect -- the alternative
approach embodied in Stromberg, for example, accords no
significance to Congress's use of the term "original jurisdiction."
In light of the historical and legal context to Congress's
enactment of § 1367, including the settled interpretation of § 1441
and the established limits on pendent and ancillary jurisdiction,
we conclude that Congress intended to preserve the Clark anti-

---

[15] Congress may have included the reference to Rule 19
plaintiffs simply to be clear that a plaintiff joined as an
indispensable party under Rule 19 is in exactly the same situation
as one who intervenes as of right under Rule 24(a).  Before the
enactment of § 1367, ancillary jurisdiction worked differently
under Rules 19 and 24.  See generally Rowe, Burbank, & Mengler,
Congress Accepts Supreme Court's Invitation to Codify Supplemental
Jurisdiction, 74 Judicature 213, 215 (Dec./Jan. 1991) (describing
the identical treatment of plaintiffs under Rules 19 and 24 as the
"one modest but significant way" in which § 1367(b) was intended to
alter prior law).
Similarly, others have offered explanations for the reference
in § 1367(b) to claims against persons made parties under Rule 19
or 20.  See, e.g., Pfander, Supplemental Jurisdiction and Section
1367: The Case for a Sympathetic Textualism, 148 U. Pa. L. Rev.
109, 144-46 (1999) (Rule 20 defending parties); Rowe, Burbank, &
Mengler, Compounding or Creating Confusion About Supplemental
Jurisdiction?  A Reply to Professor Freer, 40 Emory L.J. 943, at
957-58 (1991) (hereinafter Rowe et al., Compounding or Creating
Confusion) (Rule 19 defending parties).

aggregation rule by requiring that the district courts must have "original jurisdiction" over the "civil action" before supplemental jurisdiction will lie.

        b.   <u>Section 1367 and the Complete Diversity Rule</u>

There is a further reason why we reject the alternative reading of § 1367 set out in the Seventh Circuit's opinion in <u>Stromberg</u>. As we have said, <u>Stromberg</u>'s reading of the statutory text is, while imperfect, at least plausible. Yet it also has surprising and far-reaching consequences: if § 1367 permits the permissive joinder of plaintiffs who cannot meet the amount-in-controversy requirement, then it also permits the joinder of non-diverse plaintiffs. Nothing in the statute distinguishes between the <u>Clark</u> amount-in-controversy requirement and the complete diversity rule in <u>Strawbridge</u>. So if <u>Stromberg</u>'s interpretation of § 1367 is correct, Congress overturned nearly 200 years of case law interpreting § 1332 and authorized a potentially huge expansion of the federal docket. Moreover, it did so not by amending the diversity statute itself, but instead by failing to mention Rule 20 plaintiffs in § 1367(b).[16]

_____

[16] <u>Stromberg</u> itself recognized that "[s]upplemental jurisdiction has the potential to move from complete to minimal diversity." 77 F.3d at 932. Nevertheless, the court concluded that § 1367(b) is adequate to protect the interests served by the <u>Strawbridge</u> complete diversity rule. <u>Id.</u> Like many commentators, we disagree. <u>See, e.g.,</u> Fallon, Meltzer, & Shapiro, <u>Hart & Wechsler's The Federal Courts and The Federal System</u> 1491 (5th ed. 2003) (describing the omission of Rule 20 plaintiffs from § 1367(b) as "puzzling" because it allows plaintiffs "to circumvent the

We do not think Congress intended § 1367 to work such a revolution in the law of diversity jurisdiction. Cf. Whitman v. Am. Trucking Assns., 531 U.S. 457, 467-68 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions -- it does not, one might say, hide elephants in mouseholes."). Congress has long maintained a policy of restricting diversity jurisdiction, not expanding it, chiefly by raising the amount-in-controversy bar.[17] Indeed, the same congressional Federal Courts Study Committee that proposed overturning Finley and codifying supplemental jurisdiction also proposed eliminating most forms of diversity jurisdiction. See Federal Courts Study Committee, Report of the Federal Courts Study

complete diversity requirement of § 1332"); Gold, Note, Supplemental Jurisdiction over Claims by Plaintiffs in Diversity Cases: Making Sense of 28 U.S.C. § 1367(b), 93 Mich. L. Rev. 2133, 2167 n.140 (1995) (the omission of Rule 20 plaintiffs must be "inadvertent[]" because a literal reading of § 1367(b) "would allow plaintiffs to strategically circumvent the complete diversity requirement"); Rowe et al., Compounding or Creating Confusion, supra, at 961 n.91 (describing § 1367(b)'s silence about Rule 20 plaintiffs as a "potentially gaping hole in the complete diversity requirement").

[17] In 1887, the minimum amount in controversy was $2,000. See Act of March 3, 1887, 24 Stat. 552. Since that time, Congress has repeatedly raised, and never lowered, the required sum. See Act of March 3, 1911, 36 Stat. 1091 (raising the minimum amount in controversy to $3,000); Act of July 25, 1958, Pub. L. No. 85-554, § 2, 72 Stat. 415 (raising the minimum amount to $10,000); Judicial Improvements and Access to Justice Act, Pub. L. No. 100-702, § 201, 102 Stat. 4642 (1988) (raising the minimum amount to $50,000); Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 205, 110 Stat. 3847 (raising the minimum amount to $75,000). We leave aside the special case of class actions. See infra note 19.

Committee 39 (1990) ("We believe that diversity jurisdiction should be virtually eliminated . . . . [N]o other step will do anywhere nearly as much to reduce federal caseload pressures and contain the growth of the federal judiciary."). Congress did not accept that proposal, to be sure, but that hardly suggests it wanted to expand diversity jurisdiction. On the contrary, only a few years after enacting § 1367, Congress again raised the amount-in-controversy bar in an effort to reduce the diversity caseload in the federal courts. See Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 205, 110 Stat. 3847 (raising the minimum amount in controversy from $50,000 to $75,000). The Supreme Court, too, has repeatedly admonished that in light of the burgeoning federal caseload, diversity jurisdiction must be narrowly construed. See, e.g., Snyder, 394 U.S. at 340-41; City of Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 76 (1941); Healy v. Ratta, 292 U.S. 263, 270 (1934).

Against this background, it is implausible to us that Congress undermined Strawbridge and overturned Clark by such an unlikely and obscure device as the omission of Rule 20 plaintiffs from § 1367(b). Nixon v. Mo. Mun. League, 124 S. Ct. 1555, 1564 (2004) (refusing to adopt a textually plausible interpretation of a statute because it was "farfetched that Congress meant . . . to start down such a road in the absence of any clearer signal"); Chisom v. Roemer, 501 U.S. 380, 396 & n.23 (1991) ("[I]f Congress

had such an intent, Congress would have made it explicit in the statute, or at least some of the Members would have identified or mentioned it . . . .  Congress' silence in this regard can be likened to the dog that did not bark.").

Moreover, Congress has continued to regard Strawbridge as good law even after § 1367.  Since 1990, Congress has enacted at least two statutes limiting the rule of complete diversity.  Each time, Congress has done so clearly and conspicuously, carefully circumscribing the situations in which Strawbridge will not apply. See Multiparty, Multiforum Trial Jurisdiction Act of 2002, Pub. L. No. 107-273, § 11020(b)(1)(A), 116 Stat. 1758 (codified at 28 U.S.C. § 1369) (granting the district courts original jurisdiction over "any civil action involving minimal diversity" between adverse parties arising from any single accident in which 75 natural persons died, and further defining "minimal diversity" in the case of both natural and corporate parties);[18] Y2K Act, Pub. L. No. 106-37, § 15(c), 113 Stat. 185 (1999) (codified at 15 U.S.C. § 6614(c)) (granting the district courts original jurisdiction over "any Y2K action that is brought as a class action," except where a "substantial majority" of the plaintiff class is from the same

---

[18] The dissent points to the Multiparty, Multiforum Trial Jurisdiction Act (MMTJA) as evidence that Congress is backing away from its long history of restricting diversity jurisdiction.  We disagree.  Our conclusion is that Congress is keenly aware of the limits on diversity jurisdiction and expects those limits to apply except where, as in the MMTJA, it specifically and unambiguously alters them.

state as the "primary" defendants and the claims in the action will be governed primarily by the law of that state).

Congress thus knows how to limit Strawbridge clearly when it wishes, and it would have had little reason to enact these statutes if it believed that it had already undermined the complete diversity rule in the supplemental jurisdiction statute. Plainly it did not so believe, and that understanding informs our choice among plausible interpretations of § 1367. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 143 (2000) ("At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings. . . . This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.").

c. Legislative History of § 1367

Finally, the legislative history of § 1367 strongly corroborates the conclusion that Congress did not intend to repudiate Clark or Strawbridge. Resort to legislative history is appropriate where, as here, the text of a statute is susceptible to two textually plausible interpretations. Lapine v. Town of Wellesley, 304 F.3d 90, 97 (1st Cir. 2002); Hernandez-Colon v. Sec. of Labor, 835 F.2d 958, 960 (1st Cir. 1988). That is particularly true in this case, given that our sister circuits have reached conflicting answers to the same question based on the same

-39-

statutory text.  Cf. In re BankVest Capital Corp., 360 F.3d 291, 297 (1st Cir. 2004) ("[W]e are hard-pressed to endorse any 'plain meaning' argument where, as here, other federal courts have reached conflicting answers to the same question based on the same 'plain' language.").

The legislative history of § 1367 is somewhat muddled in its details, but one fact is certain:  Congress did not believe that § 1367 would make significant changes to the law of diversity jurisdiction.  The House Judiciary Committee report -- the only congressional report concerning the provision that became § 1367 -- stated that the bill was intended to "essentially restore the pre-Finley understandings of the authorization for and limits on . . . supplemental jurisdiction."  H. Rep. No. 101-734, at 28 (Sept. 10, 1990), reprinted in 1990 U.S.C.C.A.N. 6860, at 6874.  The same report made clear that Congress anticipated no sweeping changes in the operation of § 1332:  "In diversity cases, the district courts may exercise supplemental jurisdiction, except when doing so would be inconsistent with the jurisdictional requirements of the diversity statute."  Id.

The bill's sponsors similarly did not believe that § 1367 would alter the fundamental rules of diversity jurisdiction. Senator Grassley stated that the bill did not "represent major changes in the law."  136 Cong. Rec. at S17578 (Oct. 27, 1990).  He and other sponsors repeatedly described the bill as

"noncontroversial." See, e.g., id.; id. at H13313 (Oct. 27, 1990) (statement of Rep. Kastenmeier). And Congress treated it that way -- committee hearings on the bill lasted only one day. See Rowe, Burbank, & Mengler, supra, at 1005 (describing the process afforded to the bill in Congress as "meager"). At no point in the legislative process did any member of Congress suggest that § 1367 would overturn Clark, undercut the complete diversity rule, or otherwise dramatically expand federal diversity jurisdiction.[19]

## III.

We hold that § 1367 does not authorize jurisdiction over Beatriz's family members' claims. Those claims would have been barred under Clark before 1990, and we conclude that Congress did not upset that rule when it overturned Finley and codified the prior law of pendent and ancillary jurisdiction in § 1367.[20]

---

[19] We express no view on the related but distinct issue of whether § 1367 overturns the Supreme Court's holding in Zahn v. International Paper Co., 414 U.S. 291 (1973), that each class member in a diversity-only class action must meet the jurisdictional amount in controversy. See id. at 301. The application of § 1367 to diversity-only class actions is a different problem for several reasons, including because (1) the complete diversity rule applies with diminished force in the class-action context, see Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 366 (1921); (2) section 1367(b) does not mention Rule 23 at all, while it mentions Rule 20 at least as to defending parties; and (3) there are conflicting signals in the legislative history as to whether Congress intended to overrule Zahn, see Payne, 229 F. Supp. 2d at 51-52 (summarizing the "murk[y]" legislative history on this point).

[20] The dissent argues that Congress could not have intended this result because it is too similar to the outcome in Finley, which Congress meant to overturn. The analogy to Finley, however,

The judgment of the district court is **<u>affirmed</u>** as to Beatriz's family members.  As to Beatriz, the judgment is **<u>vacated</u>** and the case is **<u>remanded</u>**.  On remand, Beatriz may elect to proceed alone in federal court or, if she wishes, voluntarily dismiss her complaint so that she and her family may re-file in the Puerto Rico courts.

**(Dissenting opinion follows)**

---

is both inaccurate and unpersuasive.  <u>Finley</u> involved an exclusively federal claim under the FTCA; this case is predicated only on diversity.  That is a critical difference:  the rules of pendent jurisdiction have always been more flexible in federal-question cases than in diversity cases, <u>see</u> <u>supra</u> note 13, no doubt to facilitate a federal forum for claims arising under federal law.  The federal interest in Beatriz's family members' ability to assert their state-law claims in federal court is much more attenuated.

In <u>Finley</u>, moreover, there was no forum available in which the federal plaintiff could assert all of her claims.  <u>See</u> <u>Finley</u>, 490 U.S. at 555-556.  In this case, by contrast, such a forum is readily available:  the courts of Puerto Rico.  It was the plaintiffs who chose to sue in federal court.  Against that background, the dissent's judicial efficiency arguments ring hollow. <u>Cf.</u> <u>Kroger</u>, 437 U.S. at 376 ("A plaintiff cannot complain if ancillary jurisdiction does not encompass all of his possible claims in a case such as this one, since it is he who has chosen the federal rather than the state forum . . . .").

**TORRUELLA**, <u>Circuit Judge</u> (Concurring in part, dissenting in part II.B).  I concur in part II.A of the majority opinion.  I also agree that courts are wise to tread carefully when deciding cases, such as this, where a court must interpret a statute defining the parameters of its own powers.  My agreement with the majority opinion, however, ends there.

In an attempt to limit diversity jurisdiction, the majority opinion mixes a "sympathetic textualist" approach to statutory interpretation with a dash of legislative intent to reach a conclusion that is contrary to the plain language of § 1367.  The irony of the majority opinion is that it espouses the virtue of legislative intent, yet adopts a reading of § 1367 that was never articulated by any Congressperson or their staff, by any judge or jurist, nor by any academics, or, most importantly, by any of the very drafters of the statute from the time the statute was adopted in 1990, until such "intent" was just espoused in 1998.  Section 1367 was the law for over seven years before a new alternative interpretation of § 1367 was proposed by Professor Pfander and adopted by the Tenth Circuit.  <u>See</u> <u>Leonhardt</u> v. <u>W. Sugar Co.</u>, 160 F.3d 631, 639 n.6 (10th Cir. 1998).  This dubious approach has now been adopted by this circuit, despite the fact that it ignores the plain meaning of § 1367, causes the same word in the statute to have two meanings, and makes an entire provision of § 1367 meaningless.

It is because I believe that a court's role is limited to applying the statute, not changing the statute, that I respectfully dissent. In doing so, I join the majority of our sister circuits that have interpreted 28 U.S.C. § 1367 to grant a district court jurisdiction to hear a plaintiff's claim that does not meet the amount-in-controversy, if a co-plaintiff's claim satisfies the amount-in-controversy requirement.

## I. Joinder and class actions

Before analyzing § 1367 and its meaning, one observation must be made. The majority begins its analysis of § 1367 by noting that our sister circuits are evenly split on the issue of whether § 1367 allows a plaintiff who does not independently meet the amount-in-controversy requirement of § 1332 to remain in federal court. This statement is misleading. While it is true that only two circuit courts, the Third and Seventh Circuits, have addressed § 1367's applicability outside the context of a class action, in reality, five circuit courts have interpreted § 1367 to allow a plaintiff who does not independently meet the amount-in-controversy requirement of § 1332 to remain in federal court, whereas three circuit courts require them to take their claims to state court.[21]

---

[21] Compare Allapattah Serv., Inc. v. Exxon Corp., 333 F.3d 1248 (11th Cir. 2003) (holding supplemental jurisdiction exists in a diversity class action as long as one named plaintiff satisfies the amount-in-controversy requirement); Gibson v. Chrysler Corp., 261 F.3d 927 (9th Cir. 2001) (same), cert. denied, 534 U.S. 1104 (2002); Rosmer v. Pfizer Inc., 263 F.3d 110 (4th Cir. 2001) (same), cert. dismissed, 536 U.S. 979 (2002); Stromberg Metal Works, Inc.

Rather than addressing these cases and their arguments, the majority opinion casts them aside by arguing that the class action context differs from the Rule 20 joinder context. Such a characterization is misguided for several reasons.

First, the majority opinion fails to acknowledge that for § 1367 purposes, Clark and Zahn stand for the same principle. In Clark v. Paul Gray, Inc., the Supreme Court held that each plaintiff's claim must meet the amount-in-controversy requirement. 306 U.S. 583 (1939). In Zahn v. Int'l Paper Co., the Supreme Court held that each class member's claim must meet the amount-in-controversy requirement. 414 U.S. 291, 301 (1973). Thus, Clark "is the nonclass analog to Zahn. Section 1367, on its face, overrules Clark, just as it overrules Zahn." Richard D. Freer, The Cauldron Boils: Supplemental Jurisdiction, Amount in Controversy, and Diversity of Citizenship Class Actions, 53 Emory L.J. 55, 58 n.19 (2004).

---

v. Press Mech. Inc., 77 F.3d 928 (7th Cir. 1996) (holding supplemental jurisdiction exists over a party who failed to meet the amount-in-controversy requirement); In re Abbott Labs., 51 F.3d 524 (5th Cir. 1995) (holding supplemental jurisdiction exists in a diversity class action as long as one named plaintiff satisfies the amount-in-controversy requirement), with Trimble v. Asarco, Inc., 232 F.3d 946 (8th Cir. 2000) (holding supplemental jurisdiction does not exist in class action diversity case); Meritcare Inc. v. St. Paul Mercury Ins. Co., 166 F.3d 214 (3d Cir. 1999) (holding supplemental jurisdiction does not apply to a diversity case); Leonhardt, 160 F.3d 631 (holding supplemental jurisdiction does not exist in class action diversity case).

This position has been adopted by every circuit court to consider the issue. As the Seventh Circuit noted, "§ 1367 does not distinguish class actions from other cases . . . [and section 1367] affects Clark and Zahn equally." Stromberg Metal Works, 77 F.3d at 931.[22] Similarly, the Third Circuit, the only circuit with which the majority aligns itself, admits that "the line of cases from Pinel to Zahn applies equally to joinder cases and class action." Meritcare Inc., 166 F.3d at 218.[23] The purpose of Zahn was to clarify that, for amount-in-controversy purposes, the proposition established in Clark applies in the class action context. See Zahn, 414 U.S. at 301; Snyder v. Harris, 394 U.S. 332, 335-37 (1969) (treating class actions the same as cases with joined plaintiffs for purposes of aggregation rules).

Second, if a distinction were to be made between class actions and joinder, the distinction would favor allowing supplemental jurisdiction in joinder situations, and not in class action situations, as "it is hard to avoid remarking that allowing thousands of small claims into federal court via the class device

---

[22] See also In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599, 607 (7th Cir. 1997) (agreeing that § 1367 allows supplemental jurisdiction in either a class action or joinder situation); Rosmer, 263 F.3d at 122-29 (Motz, J., dissenting) (interpreting the majority's interpretation of § 1367 to apply to Rule 20 joinder as well as class actions).

[23] See also, Richard D. Freer, Toward a Principled Statutory Approach to Supplemental Jurisdiction in Diversity of Citizenship Cases, 74 Ind. L.J. 5, 21-22 (1998).

is a substantially greater expansion of jurisdiction than is allowing a single pendent party." Stromberg Metal Works, 77 F.3d at 931. Thus, it is "easy to imagine wanting to overturn Clark but not Zahn; it is much harder to imagine wanting to overturn Zahn but not Clark, and we have no reason to believe that Congress harbored such a secret desire." Id.

## II. **The plain meaning of § 1367**

When interpreting a statute, the starting point is the statute's text. See Bennett v. City of Holyoke, 362 F.3d 1, 9 (1st Cir. 2004). Section 1367(a) provides that district courts shall have supplemental jurisdiction over claims that form part of the same case or controversy as any civil action of which the court has original jurisdiction.[24] For diversity purposes, a district court has original jurisdiction if the plaintiff's citizenship differs from the defendant's and the claim exceeds $75,000. See 28 U.S.C. § 1332.

Section 1367(b) creates exceptions to § 1367(a) if (1) jurisdiction is based on diversity (§ 1332), (2) the plaintiff is

---

[24] Section 1367(a) states: "(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

-47-

the party seeking to assert supplemental jurisdiction against persons made parties under Rule 14 (third-party practice), 19 (mandatory joinder), 20 (permissive joinder), or 24 (intervention) of the Federal Rules of Civil Procedure or persons proposed to be joined as plaintiffs or intervene as plaintiffs under Rules 19 and 24 respectively, and exercising jurisdiction over the supplemental claims would be inconsistent with the statutory requirements of diversity jurisdiction under § 1332.[25]

Section 1367(c) creates further exceptions, notably awarding a district court discretion to decline supplemental jurisdiction if the supplemental jurisdiction claim predominates over the claim that has original jurisdiction.[26]

---

[25] Section 1367(b) states: "In any civil action of which the district courts have original jurisdiction founded solely on [diversity], the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14 [third-party practice], 19 [mandatory joinder], 20 [permissive joinder], or 24 [intervention] of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332."

[26] Section 1367(c) states: "(c) The district courts may decline to exercise supplemental jurisdiction over a claim . . . if-- (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

Applying § 1367(a) to the present case is straightforward. Before supplemental jurisdiction can apply, a district court must have original jurisdiction over a claim. In this case, the district court has jurisdiction over Beatriz's claims because Beatriz is a citizen of a different state than Star-Kist and has alleged claims for which it is not a legal certainty that the damages are less than $75,000. See 28 U.S.C. § 1332. Since the district court has jurisdiction over Beatriz's claims, it may assert supplemental jurisdiction over Beatriz's family members' claims if they arise out of the same case or controversy. See 28 U.S.C. § 1367(a). There is no dispute that all of the claims in this case arise out of the same case or controversy.

Supplemental jurisdiction may attach unless one of the exceptions applies. See 28 U.S.C. § 1367(b) & (c). The exceptions pertaining to Federal Rule of Civil Procedure 14 (third-party practice), Rule 19 (mandatory joinder), Rule 20 (permissive joinder), or Rule 24 (intervention) are inapplicable to this case as there are no claims by plaintiffs against persons made parties under those rules. The further exception pertaining to Federal Rule of Civil Procedure 19 does not apply as Beatriz's family members are not indispensable parties. The last exception pertaining to Federal Rule of Civil Procedure Rule 24 does not apply as the family members are not seeking to intervene. Thus, none of the exceptions in § 1367(b) apply.

The exceptions in § 1367(c) also do not apply. The claims of Beatriz's family members do not raise novel or complex issues of Commonwealth law, their claims do not substantially predominate Beatriz's claims, and there do not tend to be any compelling reasons for declining jurisdiction. Thus, a plain, straightforward reading of § 1367 results in the district court having jurisdiction over Beatriz's family members' claims.

## III.  **The majority opinion's alternative approach**

The majority opinion disagrees with this conclusion, however, by arguing that the term "original jurisdiction" in § 1367(a) has two distinct meanings. In federal-question cases, § 1367 applies if <u>at least one</u> claim qualifies for "original jurisdiction." But, in diversity cases, the majority argues, § 1367 applies only if <u>all</u> claims qualify for original jurisdiction. This contrived reading of § 1367 is wrong for several reasons.

First, the majority's interpretation of § 1367(a) violates "the basic canon of statutory construction that identical terms within an Act bear the same meaning." <u>Estate of Cowart</u> v. <u>Nicklos Drilling Co.</u>, 505 U.S. 469, 479 (1992). In this case, not only does the majority opinion define identical terms differently, it defines the same term differently. There is "nothing in the text of subsection (a) to suggest, even remotely, that there is

-50-

such a difference in meaning."  See Gibson, 261 F.3d at 936; Rosmer, 263 F.3d at 115-16.

The majority opinion appears to be oblivious to this blatant violation of the rules of statutory construction because it believes Congress "presumptively incorporated into § 1367 the longstanding, judicially developed doctrines that determine whether those statutes confer 'original jurisdiction.'" (emphasis added). In addition to there being no authority for this "presumption," the majority incorrectly applies another longstanding doctrine that accompanies original jurisdiction to reach that conclusion.  For supplemental jurisdiction purposes, the majority contends that the term "original jurisdiction" in a diversity case requires that every claim meet the requirement of "original jurisdiction."  In stating this principle, the majority overlooks the process by which a court determines if "original jurisdiction" exists.  Both §§ 1331 and 1332 "confer original jurisdiction over designated 'civil actions' . . . [which] consist of a cluster of claims, . . . [and which] the rules of federal subject-matter jurisdiction apply on a claim-by-claim basis."  John B. Oakley, Integrating Supplemental Jurisdiction and Diversity Jurisdiction:  A Progress Report on the Work of the American Law Institute, 74 Ind. L.J. 25, 41-42 (1998); see also Freer, 53 Emory L.J. at 82-83.  One claim's failure to qualify for original jurisdiction does not mean that all claims fail to qualify for original jurisdiction.  Whether the case is

filed in federal court or removed to federal court, "it is incontrovertible that [§ 1332] . . . requires only the dismissal of the jurisdictionally insufficient claims, not the entire action." Oakley, 74 Ind. L.J. at 47; Freer, 53 Emory L.J. at 82-83; see also Clark, 306 U.S. at 590 (maintaining jurisdiction over one claim that met the amount-in-controversy and dismissing the claims that failed to meet the amount-in-controversy). Thus, the fact that a case contains claims that destroy diversity does not prevent the court from maintaining jurisdiction over the claims that qualify for "original jurisdiction." See Oakley, 74 Ind. L.J. at 47; Clark, 306 U.S. at 590; see also Fed. R. Civ. P. 21; Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 834-35 (1989) (holding that courts of appeals have the authority to dismiss a dispensable non-diverse party).

The very language of § 1367 incorporates this concept. Section 1367(a) states that a court shall have supplemental jurisdiction over all other claims that are "so related to claims in the action." The "other claims" join the related claims (those qualifying for original jurisdiction) as part of the civil action.

In this case, Beatriz's claims qualified for "original jurisdiction." On remand, it will be undisputed that Beatriz's claims constitute "a civil action of which the district courts have original jurisdiction." See 28 U.S.C. § 1367. Once the majority opinion concluded that the district court had "original

-52-

jurisdiction" over the "civil action" consisting of Beatriz's claims, it should have turned to § 1367's statement that "in any civil action of which the district courts have original jurisdiction [(Beatriz's claims)], the district courts shall have supplemental jurisdiction over all other [related] claims [Beatriz's family's claims)]." Id. Instead of taking this step, the majority opinion attempts to redefine the practice of interpreting § 1332 claims to achieve a result contrary to that dictated by § 1367.[27]

Further, the majority's interpretation of § 1367(a) violates "[t]he cardinal principle of statutory construction . . . to give effect, if possible, to every clause and word of a statute, . . . rather than to emasculate an entire section." United States v. Menasche, 348 U.S. 528, 538 (1955) (internal quotations and

---

[27] The majority attempts to justify its approach by arguing that Congress should have explicitly stated that supplemental jurisdiction exists if one claim supports original jurisdiction. First, such specificity is not required as it is undisputed that one claim can constitute a civil action.

Second, we can argue "could have" or "should have" ad infinitum. If Congress had wanted to limit supplemental jurisdiction in cases such as this, for example, it could have inserted a Rule 20 plaintiff exception into § 1367(b), as it did for other Rules of Civil Procedure. If Congress had done so, the majority would not need to resort to its dubious "sympathetic textualist" interpretation of the statute.

In a case like this, a debate over what Congress could have done is unproductive and unnecessary when a plain reading of the statute produces one clear result: a district court has jurisdiction over supplemental claims if the district court has original jurisdiction over a claim in the civil action.

citations omitted).  The majority's interpretation of § 1367(a) eviscerates portions of § 1367(b).  As the majority is forced to admit, its interpretation of § 1367 makes the Rule 19 exception in § 1367(b) "unnecessary."  What the majority does not admit is that its interpretation makes other provisions of § 1367 superfluous.  See Freer, 53 Emory L.J. at 81.  For example, according to the majority's interpretation of § 1367, "original jurisdiction" would not exist over a claim made by a plaintiff against a non-diverse defendant joined under Rule 20 of the Federal Rules of Civil Procedure.  The majority's interpretation cannot be correct, however, because section 1367(b) specifically excepts supplemental jurisdiction over a claim made by a plaintiff against a non-diverse defendant joined under Rule 20.  See Gibson, 261 F.3d at 936; Rosmer, 263 F.3d at 115.  The only reason § 1367(b) would contain such an exception is if § 1367(a) provides jurisdiction for joined claims against non-diverse defendants.  If, as the majority contends, "'original jurisdiction' under subsection (a) were determined by looking at all the claims in the complaint, there would have been no jurisdiction under § 1332 (and hence no 'original jurisdiction') in the first place." Gibson, 261 F.3d at 936.  Thus, the exclusion of supplemental jurisdiction of claims by non-diverse parties joined under Rule 20 would be surplusage.

## IV.  Congressional intent & legislative history

Recognizing that its interpretation of § 1367 results in an "imperfect" reading based on "presumptions," the majority opinion attempts to buttress its position by referring to Congressional intent and legislative history.  The majority opinion begins by noting that "Congress has long maintained a policy of restricting diversity jurisdiction."  Relying on "long maintained" policy is problematic for several reasons.  First, Congressional action in the past sheds little light on what the 101st Congress believed when it passed § 1367.  Rather than speculate on what was done in the past, it is more fruitful to look at the actions of the Congress that adopted § 1367.  In 1990, the same Congress that passed § 1367 was given the Report of the Federal Courts Study Committee which recommended "diversity jurisdiction should be virtually eliminated."  This recommendation was rejected by Congress.  We should not achieve through judicial action what the Federal Courts Study Committee could not convince Congress to achieve.  Ultimately, it is not unreasonable to believe that Congress read the plain language of § 1367, recognized that it allowed diversity jurisdiction for supplemental plaintiffs, and voted for it.

Second, the continued validity of Congress's "long maintained policy" of restricting diversity jurisdiction is called into question by Congress's expansion of federal jurisdiction based

upon minimal diversity in the Multiparty Multi-Forum Trial Jurisdiction Act in 2002. See 28 U.S.C. § 1369.

Third, and perhaps most convincing is the fact that a proposed amendment achieving the majority's result in this case, that would limit supplemental jurisdiction in Rule 20 & 23 cases has been circulating in Congress since 1998. Freer, 53 Emory L.J. at 58-59. This amendment has done nothing more than circulate for six years. Id. Congress has reasonably rejected that view.

To conclude its opinion, the majority cites to an admittedly "muddled" legislative history for support. The legislative history, however, is so sparse and contradictory that it neither supports nor undermines the majority opinion's conclusions. Section 1367 was passed by the House of Representatives with no floor discussion on any part of the statute. Freer, 53 Emory L.J. at 73. The Senate voted on § 1367 with little debate. Id. The bill was introduced by Senator Grassley as "noncontroversial."

What little legislative history surrounds § 1367 is internally contradictory. For example, § 1367 "was said to be part of the 'less controversial' proposals of the . . . Federal Courts Study Committee . . . [but] that Committee never drafted a statute on supplemental jurisdiction." Richard D. Freer, Compounding Confusion and Hampering Diversity:  Life after Finley and the Supplemental Jurisdiction Statute, 40 Emory L.J. 445, 471 (1991).

Further, despite the Senator's words, and excluding the controversy surrounding supplemental jurisdiction, § 1367 was highly controversial because of its treatment of Rule 19 and its adoption of a proposal that differed substantially from the Federal Court Study Committee proposal. See Christopher M. Fairman, Abdication to Academia: The Case of the Supplemental Jurisdiction Statute, 28 U.S.C. § 1367, 19 Seton Hall Legis. J. 157, 164 (1994).

Perhaps the most relevant piece of legislative history is the fact that Congress passed § 1367 in reaction to the Supreme Court's holding in Finley, which held that a plaintiff suing the United States in a Federal Tort Claims Act case could not join a defendant, against whom there were only state law claims, without an independent basis for federal jurisdiction. See Finley v. United States, 490 U.S. 545 (1989). Had Finley not been overturned by § 1367, a plaintiff, such as the one in Finley, would have been required to either (1) split the case in two and bring the federal claim in federal court and the state claims in state court, or (2) forsake one of the two claims. To prevent such a result, Congress enacted § 1367.

The majority opinion in this case achieves a result similar to that Congress was trying to avoid by overruling Finley. As in Finley, the plaintiffs in this case must either (1) pursue Beatriz's claims in federal court and her family's claims in state court, (2) dispose of her family's claims altogether, or (3) pursue

-57-

all of the claims in state court.  The first option leads to a waste of judicial resources and a potential for inconsistent verdicts.  The second option deprives Beatriz's family of their day in court.  The third option, not present in <u>Finley</u>, deprives Beatriz of a federal forum and of her right to a trial by jury, as her case would not receive a jury trial in the Commonwealth courts.[28]  As Congress showed by overturning <u>Finley</u>, being faced with these options should be avoided.

Ultimately, as the majority concedes, the legislative history is muddled and can be used to support or to contradict either position.  In the end, the unclear legislative history leaves us where we started:  with the text of the statute.

## V.  <u>Conclusion</u>

The majority proposes an interpretation of § 1367 that not one Congressman or drafter of § 1367 ever espoused, much less envisioned.  In contrast, I support a plain reading of § 1367 that even the drafters admitted was the correct plain reading of the statute.[29]  The majority proposes an interpretation of § 1367 that

---

[28] The third option is also unrealstic considering judgments in the Commonwealth courts are far below those awarded in the federal courts.  <u>See</u>, <u>e.g.</u>, <u>Stewart</u> v. <u>Tupperware Corp.</u>, 356 F.3d 335 (1st Cir. 2004).

[29] <u>See</u> Rowe Jr., Burbank, & Mengler, <u>Compounding or Creating Confusion About Supplemental Jurisdiction?  A Reply to Professor Freer</u>, 40 Emory L.J. 943, 961 n.91 (1991) (recognizing that the § 1367 left a "potentially gaping hole in the complete diversity requirement").

violates many rules of statutory construction. In contrast, I support a reading of the statute in which words are not required to have double meanings and each phrase has a purpose. Last, the majority's interpretation leads to a waste of judicial resources and the possibility of inconsistent verdicts. In contrast, I support a reading which preserves judicial resources.

I am comforted by and conclude with a statement by the Supreme Court in <u>Finley</u>: "Whatever we say regarding the scope of jurisdiction conferred by a particular statute can of course be changed by Congress" or, in this case, by the Supreme Court. <u>Finley</u>, 490 U.S. at 556.